Roland CRAWFORD, pro ami, Appellant,

v.

MID–AMERICA INSURANCE COMPANY, Respondent.

No. 25911.

Missouri Court of Appeals, Kansas City District.

Dec. 4, 1972.

P. M. Marr, Milan, and Eugene E. Andereck and Terry M. Evans, Trenton, Pickett, Andereck, Hauck & Sharp, Trenton, of counsel, for appellant.

Joseph W. Amick, Kansas City, Jackson & Sherman, Kansas City, of counsel, for respondent.

Before SHANGLER, C. J., PRITCHARD and WASSERSTROM, JJ., and PETERS, Special Judge.

PRITCHARD, Judge.

Roland Crawford appeals from a final judgment upon a "student accident insurance policy" which set aside a portion of the verdict of the jury allowing $218.00 penalty and $1,000.00 for attorney's fees as damages for respondent's allegedly vexatious refusal to pay the claim under the policy. Mid-America Insurance Company cross-appeals on the final judgment entered against it for $2,180.20 as damages for medical expense of Roland contending that he was not participating in an extracurricular activity under the supervision of the (school) policyholder. It is also claimed that Instruction No. 2 is in error because it

did not specify the activity in which Roland was engaged at the time of his injury.

On August 14, 1969, Mid-America issued its master Scholastic Accident Insurance Policy to Putnam County R–I School District effective August 25, 1969 and terminating May 25, 1970. Under the policy Roland was insured under "Plan Two School Time Accident Coverage." Roland did not subscribe to the available "Plan One 24 Hour Accident Coverage" under the school policy. Plan Two, Special Notice To Parents, provided benefits from accidental bodily injuries received by the insured and while covered under the policy and while [as here pertinent], (3) Participating in or attending school-sponsored and supervised activities, except as otherwise provided in the policy, including supervised travel to and from such activities. Attached to the "Special Notice To Parents" was application for student coverage, and the notice had the sentence: "See the Master Policy on File with the school for complete Details."

In somewhat different words the insuring agreements of the master policy provided: "If any person as a result, directly and independently of all other causes [sic], of bodily injuries caused by accidental means occurring while insured hereunder and while * * * (3) participating in extracurricular activities under the supervision of the Policyholder during a school term in which the insured person is either regularly enrolled as a student or actively employed under the supervision of the Policyholder; * * * (6) * * * For the purposes of this insurance an extracurricular activity shall be deemed to be under the supervision of the Policyholder only if the activity is directly supervised by an employee specifically designated by the Policyholder for that purpose who is physically present at the place where the activity is being conducted."

According to Elenora Staab, benefits manager for Mid-America, whose duty it was to oversee claims (such as Roland's)

and to evaluate them, the application form (Special Notice to Parents) was distributed to parents to purchase the type of coverage which is here involved. The master policy was on file with the Putnam County District, and there were students who did vary in the two or three coverages provided. Roland's parents did purchase the coverage above set forth.

The football field at Putnam R–II School ran east and west, and its east end was about 100 feet from the school buildings. Both on the north and south sides of the field were bleachers for spectators. The school system owned the land behind the bleachers, which land was grassed except for one driveway directly behind the buildings. There was no parking lot as such provided, but the cars were parked directly behind the bleachers on the grass area, being on the north and south sides, with some persons sitting in their cars to watch the game when the weather was cold. The bleachers did not extend to the full length of the football field, but were on a small area on the 50 yard line. In going to and from restrooms, refreshment stands and before the game, spectators passed through the area near where the cars were behind the bleachers. The practice field was the parking lot.

Marcus Hounsom was the High School Principal at Unionville, Missouri (the Putnam R–II School) on September 12, 1969. On that date he was attending a regularly scheduled football game of the school which was an extracurricular activity and he was authorized by the school to be a supervisor. Roland's injury occurred at half-time of the game when student spectators and other people get up and stretch, and go to restrooms and the refreshment stand. Mr. Hounsom had, during the half-times in the past, observed children running around getting a little rowdy, and he had authority from the school board to stop them, even to put them out of the game and off the school property. At the time of Roland's injury he was at a place, in the parking area, where Mr. Hounsom

had authority to put him off the grounds if he felt he should be. He directly supervised the grounds where the football game was taking place, moving around over the area as he usually did. In a letter of September 18, 1969, he stated to Mid-America, " 'I again repeat as I stated in Paragraph 8 of the Claim Form, that the accident did happen while under the supervision of Marcus M. Hounsom.' " There were several hundred people present at the game, and Mr. Hounsom continued his circulation through the crowd including the area of the parking lot where Roland was injured and the bleachers on the other side. Roland was at the time in Junior High School and was about 14 years old. His injury was a broken right leg between the knee and the thigh for which he was hospitalized and treated by physicians. At the time of the injury, Mr. Hounsom was some 250 feet away from the parking lot and was not aware that Roland and his friends were playing football. There was no school rule that forbade Roland's activity, but probably, Mr. Hounsom would have stopped it if he had seen them, having done so at previous football games and having taken footballs away from boys.

As noted above the policy coverage, "(3) participating in *extracurricular* activities under the supervision of the policyholder * * *" is certainly more restricted or limited than in the "Special Notice to Parents" brochure, "(3) Participating in *or attending school-sponsored* and supervised activities * * *." Note also that the "Special Notice to Parents" uses only the words "supervised activities" while paragraph 6 of the policy requires that the activity be *directly* supervised by an employee specifically designated by the policyholder for that purpose *who is physically present* at the place where the activity is being conducted. It was testified to by Mrs. Staab that the application form (Special Notice to Parents) was distributed to parents to purchase the coverage of the policy. In such a case the modern trend of authority is that insurer will not be permitted to assert the more stringent provisions of the policy. In the pocket part of 13 Appleman, Insurance Law and Practice, Section 7534 is found this observation: "Fortunately the courts, beginning to realize the realities of the relationship between the parties, particularly that the contract as set forth the insurance policy often is practicably unintelligible and generally never read, whereas brochures and other material given out by the insurer are read and relied upon, are now enforcing the contract expected by the insured, that is the contract set out in the brochure or prospectus." See also Couch on Insurance 2d, Section 4:42. There are several cases from other jurisdictions than Missouri which have adopted the rationale of this observation. In Providential Life Insurance Co. v. Clem, 240 Ark. 922, 403 S.W.2d 68, the insurer circulated a "pamphlet or application" to the students which stated, in effect, that the policy covered anyone who was killed while traveling "to and from home and school sponsored activities, providing such travel is adult supervised." The policy contained the provision: "In the event that such travel is performed by more than one motor vehicle, direct and immediate supervision shall mean in addition to the above, that at least one parent or adult school employee must be physically present in such motor vehicle; * * *." Deceased was killed while riding in the second of four cars which carried a team for a track meet. In that car there was no parent of the deceased or any "adult school employee." The trip was supervised by school officials, two of whom were in the fourth car. The court said, loc. cit. 403 S.W.2d 69 [1]: "It is our conclusion that the trial court was correct [in directing a verdict for deceased's parents]. Under Lawrence v. Providential Life Insurance Co., 238 Ark. 981, 385 S.W.2d 936, appellees had a right to rely on the wording contained in the pamphlet or application referred to previously. In that case we said: " ' * * * the application, the form of which was prepared by the insurance company, clearly states those things not

covered by the policy. The insurance company had no right to add other exclusions to the policy without the approval of the applicant'." In Beck v. Southern Oregon Health Service, Inc., 255 Or. 590, 469 P.2d 622, a booklet issued by defendant provided for "'*Dental Services* Furnished in the care and treatment of fractured jaws.'" Plaintiff suffered multiple fractures of the jaws in an automobile accident which occasioned a reconstruction of his teeth and the occlusion thereof. The court agreed with the trial judge: "dental services furnished in the care and treatment of fractured jaws" must be interpreted to mean "'exactly what it says'" and held that the dental work involved in the case was clearly within the coverage of the policy. In Barth v. State Farm Fire and Casualty Company, 214 Pa.Super. 434, 257 A.2d 671, the "all risk" insurance brochure held out information and picture representation that coverage for burglary would be afforded during nonbusiness hours. The later issued policy, which plaintiff did not read, provided "that the coverage shall only be in effect 'when the premises are open for business.'" The court held, "If the insured in the instant case did in fact rely upon the representations in the brochure, these representations should be considered as terms of the insurance contract." Cited and quoted in Barth is Farmers Mutual Auto. Insurance Co. v. Bechard, 80 S.D. 237, 122 N.W.2d 86, 1 A.L.R.3d 1124, where the court allowed the oral representations of the insurance agent to limit the exclusions of the written policy saying, "We conclude an insurance company which in its policy has written the generally broad coverage may be estopped to defend by reason of an exclusionary clause not within the terms the insured ordered and coverage which he was led to believe was contained therein." See also Anno. 36 A. L.R.3d 541 "Group Insurance: Waiver or Estoppel on Basis of Statements in Promotional or Explanatory Literature Issued to Insureds."

When the "Special Notice to Parents" is considered and compared to the provisions of the policy, not only is the salutary rule of the foregoing authorities and cases offended, but ambiguities as to the extent of afforded coverage are created. Is a student covered while either participating or *attending* a school-sponsored and supervised activity; or is the coverage limited to participation in an extracurricular activity *directly* supervised by a designated employee *who is physically present*? As to this "uncertainty of meaning" constituting ambiguity, see 95 West Corp. v. General Insurance Co. of America, Mo.App., 424 S.W.2d 350, 353 [2, 3]. In this ambiguous situation the policy provisions must be construed against Mid-America which issued the Special Notice and wrote the policy. Aetna Cas. & Sur. Co. v. Haas, Mo., 422 S.W.2d 316, 320 [4–7] and cases cited. "The test of the meaning of non-technical words in an insurance policy is not merely the meaning implied to them by the insurance experts who drafted the policy; instead, courts are more concerned with the meaning that would ordinarily be understood by the layman who bought and paid for the policy." Adams v. Covenant Security Insurance Company, Mo.App., 465 S. W.2d 32, 34 [1]. Employing those rules of construction, it is apparent that the insurance contract be viewed in the light of what Roland's parents reasonably had a right to expect as to his accident coverage —i. e., while participating or *attending* a school sponsored and supervised activity. There is no doubt that Roland was attending the regularly scheduled football game, and that Mr. Hounsom, the school principal, was supervising the *whole* activity pursuant to authority of the school. It is not necessary that his supervision duties be restricted or narrowed to an actual and direct supervision over Roland and his playmates who were throwing a football in the parking lot, or that Mr. Hounsom be actually physically present at that place and at that time. (Providential Life Insurance Co. v. Clem, supra.) It is enough that Mr.

Hounsom had the *right* to supervise (and was supervising) the entire football game including the conduct of Roland and others. In this posture Mid-America's argument that Roland's activity is likened to that of an employee who departs on a lark of his own from the scope of his employment is without merit. Compare Eckard v. World Insurance Company, 250 Iowa 782, 96 N.W.2d 454, 456, where the court said, "The term 'extra-curricular' is generally recognized to mean, 'of or pertaining to activities as debating, dramatics, and athletics which form part of the life of students, but are not part of the regular course of study', see Webster's International Dictionary. However the term is all inclusive and whether or not, in a specific instance, an activity is 'extra-curricular' is a question of fact that may depend upon the policy of each individual school." (The school policy here is clearly inferrible in that permission is granted for all students and other spectators to attend the regularly scheduled football game, and also that the activity be supervised generally by one such as Mr. Hounsom.) In Eckard, interestingly, the policy excluded coverage of one as an extracurricular spectator, but the court held that where teammates were travelling to watch a state tournament, during which travel one student was killed and his brother injured, was, under the facts, a question of coverage or non-coverage for a jury to determine. There was a beneficial gain to the school as a whole, and in addition to being spectators the students were there for a definite school purpose. See also Anno. 74 A.L.R.2d 1253, 1255. The unreported cited case of Pilot Life Insurance Company v. Carter (Tenn. App., Eastern Division), is not factually supportive of Mid-America's position here because *no* faculty member of the school accompanied students on an extracurricular school advertisement solicitation trip. The trial court here did not err in overruling Mid-America's motion for judgment in accordance with its motion for directed verdict made at the close of the case.

The possible theory that the terms of Mid-America's brochure which stated the prospective coverage by way of advertisement was not that upon which the parties tried the case. Both proceeded upon the words contained in the master policy. Since the matter of an insurer being bound by its advertising matter submitted to prospective group insurance policyholders has not heretofore been adopted in this state it would be unfair to hold Mid-America to that theory in determining whether its refusal to pay the loss was vexatious under the statute, Section 375.420, RSMo 1969, V.A.M.S. That was certainly an open and new question of law which at and before the time of trial Mid-America had a right to litigate. It was also an open question of law of whether under the facts Roland was participating in a directly supervised extra-curricular activity at the time of his injury, under the issue tried by the parties. The issue of such "participating" and "direct supervision" was a clear fact question to be determined by the jury. In all these circumstances the trial court did not err in setting aside that part of the verdict and judgment granting $218.02 statutory penalty and $1,000.00 attorney fees. See Cohen v. Metropolitan Life Insurance Company, Mo.App., 444 S.W.2d 498, 506 [10, 11]; Sommer v. Metropolitan Life Insurance Company, Mo., 449 S.W.2d 644, 647 [2]; and generally, 6A Appleman, Insurance Law and Practice, Sections 4033, 4034 and 4035, particularly page 71, relating to clear issues of fact to be submitted to the jury, and to the presence of novel legal questions, wherein statutory penalties are not taxed. The aforesaid sections of Appleman contain many Missouri cases on the subject of penalties for vexatious refusal to pay an insurance loss.

Plaintiff's main Instruction No. 2, of which Mid-America complains, is:

"Your verdict must be for plaintiff if you believe:

First, defendant issued its policy of student accident insurance to Putnam County R–I School District, and

Second, the policy was in force on September 12, 1969, when the plaintiff was injured, and

*Third, the activity engaged in by plaintiff when injured was within the terms of the policy, and*

Fourth, plaintiff was the beneficiary of the policy on the date of the injury, and

Fifth, the proof of injuries of plaintiff was furnished to defendant in accordance with the terms of the policy.

M.A.I. No. 31.08, modified, Plaintiff prepared."

(Italics added.)

In the recent case of Esmar v. Zurich Insurance Company, and Potomac Insurance Company, Mo., 485 S.W.2d 417 (decided October 9, 1972), two instructions very similar to the italicized portion of the above instruction were held to be reversible error. The identical paragraph of the instructions in Esmar was: "Second, the plaintiff sustained a loss within the terms of the policy, * * *." The court said, "The instructions are not in M.A.I., and plaintiff in defending them indicates that an attempt was made to modify or pattern them after M.A.I. 31.08. In using this instruction as a guide, there was an apparent failure to recognize that 31.08, which is titled 'Verdict Directing-Life Insurance Policy' submits only facts for determination, whereas here the submission, 'Plaintiff sustained a loss within the terms of the policy,' does not call for a factual determination by the jury. In the giving of these instructions nothing was submitted for the jury to find as a fact; but, rather, asked the jury to arrive at a legal conclusion." As in Esmar, here Instruction No. 2 failed to submit ultimate facts for determination by the jury and the judgment must be reversed and the case remanded for new trial for that reason. Should plaintiff elect to proceed under the theory that Mid-America was bound by the information to its insured contained in the "Special Notice to Parents" the ultimate facts derived from the words used therein should be employed, together with the fact that plaintiff (or his parents) relied upon such words. Should plaintiff elect to proceed under the terms of the master policy, the ultimate facts embodied in those terms should be used.

Mid-America has admitted that Roland's medical expenses were incurred in the amount of $2,180.20 and that the same were reasonable. There is no necessity again to submit the amount of damages to the jury.

That part of the judgment setting aside the verdict of penalty and attorney fees for vexatious delay is affirmed. Because of error in the giving of Instruction No. 2, that part of the judgment granting plaintiff damages under the policy is reversed, and the case is remanded for new trial on the issue of liability only.

All concur.