Anthony R. BEHR and Maryrose E. Behr, Plaintiffs-Respondents,

v.

BLUE CROSS HOSPITAL SERVICE, INC., OF MISSOURI and Missouri Medical Service, Inc., Defendants-Appellants.

No. 67828.

Supreme Court of Missouri, En Banc.

July 15, 1986.

Rehearing Denied Sept. 16, 1986.

Jonathan W. Igoe, St. Louis, for defendants-appellants.

Anthony R. Behr, pro se.

HIGGINS, Chief Justice.

Anthony and Maryrose Behr, as subscribers to a group health care program, sued Blue Cross Hospital Service, Inc., of Missouri and Missouri Medical Service, Inc., alleging breach of insurance contract, detrimental reliance and failure to pay maternity benefits. The trial court awarded the Behrs $938.00 in damages and the Court of Appeals, Eastern District, reversed. Judgment for plaintiffs affirmed.

Mr. Behr, an attorney, and his wife were eligible to obtain health care service benefits through a group contract between defendants and the Bar Association of Metropolitan St. Louis. In August 1981, the Behrs obtained coverage under the "high option program" offered the Bar Association; in anticipation of having children they enrolled in the high option program because it provided greater maternity coverage. The high option program, issued by Blue Cross Hospital Services, Inc., and Missouri Medical Services, Inc., featured an annual $100 deductible and a 100% medical reimbursement coverage.

On August 17, 1983, the Bar Association notified its members that defendant insurers were no longer willing to renew the high option program because of its "unrealistically high rates" and that a new plan was recommended. On September 21,

1983, the Bar Association offered to its membership a new comprehensive plan, the "matrix" program. The matrix program provided for lower "dues," an annual $300 deductible, a 20% co-payment paid by the insured for the first $5,000 in medical expenses and thereafter 100% coverage. The high option program was scheduled to terminate on September 28, 1983.

On September 24, 1983, the Behrs notified insurers that Maryrose Behr was 9 months pregnant. The Behrs sought to extend the high option policy for an additional month and were willing to pay high option dues: insurers declined. The Behrs paid dues under the matrix program for the month of October.

On October 4, 1983, Mrs. Behr gave birth to a daughter by normal delivery. Insurers reimbursed the Behrs according to the matrix program for medical expenses incurred after September 28, 1983. The Behrs sued to claim $938.00, the difference in benefits between the high option program and the matrix program.

Appellants contend the trial court erred in finding that liability for maternity care expenses attached under the high option program because: the high option program terminated on September 28, 1983, prior to the birth of the Behr's child; and, the Behrs had no vested rights in the high option program because a new program was made available after September 28, 1983, and the high option program provided membership benefits only at the time medical expenses were incurred during the life of that policy. The Behrs respond that their rights in the high option program had vested and attached prior to September 28, 1983; the termination of their rights was unconscionable and against public policy; and, they had detrimentally relied on the high option program.

The issue is whether the group insurance policy, issued by appellants, affords coverage to a policy holder for expenses incurred by a pregnancy after the termination of the policy where the pregnancy exists prior to termination.

It is widely held that a master group policy can be cancelled or modified by the group sponsor so as to terminate the coverage of an individual member without the latter's consent if such right is given by the contract. *Satz v. Prudential Ins. Co. of America*, 225 S.W.2d 480, 482 (Mo.App. 1949); *Blissenbach v. Provident Life & Acci. Ins. Co.*, 689 S.W.2d 707, 708 (Mo. App.1985); *see* Annot. *Group Policy Coverage Termination*, 68 A.L.R.2d 249, 255 (1959).

The Blue Cross Hospital Service Group Membership Certificate: Series A provides:

II. MEMBERSHIP AGREEMENT AND PERIOD

\* \* \* \* \* \*

B. The membership period shall begin on the date the member is accepted by BCHS which is the service date for hospital care, as such date appears on BCHS records. The membership shall continue until this Certificate or coverage hereunder is terminated for any reason as provided herein.

\* \* \* \* \* \*

VII. TERMINATION

\* \* \* \* \* \*

G. If the Group Sponsor terminates its enrollment agreement with BCHS, or makes available to the group another group hospital care program, or indemnity therefor, this Certificate shall terminate with the termination of the enrollment agreement or on the effective date of such other program, without regular conversion privileges.

The Blue Shield UCR Program Certificate provides:

VIII. AGREEMENT DURATION, RENEWAL AND CANCELLATION

\* \* \* \* \* \*

E. Cancellation or termination of this Agreement for any reason will automatically terminate the rights and privileges herein specified for all participants. . . .

The Bar Association, as group sponsor, made available to the Behrs another hospi-

tal care program (the matrix program). Appellants therefore contend that when the matrix program was made available, the Behrs' membership in the high option program was properly terminated. Appellants assert, and the court of appeals agreed, that membership benefits shall be those for which dues are being charged at the time care is provided; therefore, the only benefits to which the Behrs could be entitled after September 28, 1983, are those provided in the matrix program. Appellants also rely on the Blue Cross Group Membership Certificate: Series A which provides:

I. DEFINITIONS

   \*     \*     \*     \*     \*     \*

J. MEMBERSHIP BENEFITS. Those benefits described in this Certificate, which become applicable to a participant, as evidenced by his membership card and by the records of BCHS. The membership benefits shall, in any case, be the ones for which dues are being charged and remitted at the time the hospital care is provided hereunder....

■ However, to defeat liability on an insurance contract, the termination of the policy must be effective before any liability attaches. *Kingsland v. Missouri State Life Ins. Co.*, 228 Mo.App. 198, 66 S.W.2d 959, 961 (1934), *rev'd on other grounds Schuerman v. General Amer. Life Ins. Co.*, 232 Mo.App. 352, 106 S.W.2d 920 (Mo. 1937); *Lutsky v. Blue Cross Hospital Serv. Inc.*, 695 S.W.2d 870, 874–875 (Mo. banc 1985).

The Behrs, relying on *Blue Cross-Blue Shield v. Turner*, 43 Ala.App. 542, 195 So.2d 807 (1966), contend that liability attaches under the high option program at the time of pregnancy when the treatment became necessary and survives the termination of the policy. Appellants, relying on *Lundquist v. Illinois Life & Acci. Ins. Co.*, 24 Ill.App.2d 316, 164 N.E.2d 293 (1960), contend that no liability attaches under the policy until the hospital services are actually rendered in the hospital.

In *Turner*, the group insurance policy provided for maternity care benefits "for any condition arising out of and during pregnancy." The court held that the liability of the insurer attached at the moment of conception and that through the payments of premiums the insured had obtained an interest in the policy which was sufficient to prevent termination. The court distinguished the policy language from that which was involved in *Lundquist*, wherein the policy in question provided "when the insured, if a married woman or the wife of the insured, if a dependent, shall while this policy is in force ..., give birth to a child or children, the company will pay the expenses actually incurred in connection therewith...." The court emphasized that under the policy language used in *Turner*, benefits were provided not just for childbirth but "for any condition arising out of and during pregnancy."

In *Blissenbach v. Provident Life & Acci. Ins. Co.*, the court found the insurance policy to be similar to that of *Turner's*. The policy provided:

With respect to pregnancy, benefits will be payable as provided above for confinement beginning within nine months after termination of insurance if the pregnancy of the employee or dependent wife exists on the date of such termination, and if benefits would have been payable and the confinement begun on the date of termination of insurance. This provision shall be applicable only if this policy is in effect on the date of commencement of confinement.

The court, relying on *Turner*, held that the coverage began at the moment of conception and the coverage was for the condition arising out of and during pregnancy; thus, liability attached before termination of the policy could be affected. *Id.*, 689 S.W.2d at 709.

The Blue Cross Group Membership Certificate provides:

I. DEFINITIONS

   \*     \*     \*     \*     \*     \*

Q. MATERNITY CARE. Hospital care in obstetrical cases (including any illness resulting from pregnancy and

delivery and after care) including the use of the delivery room and nursery care of the newborn. This care will be provided only after the participant has been in good standing for a continuous period of nine (9) months next preceding the date of admission to the hospital for this care. Maternity care is provided for the member or the member's spouse only. The waiting period shall not apply in premature termination of pregnancy or to any illness resulting from pregnancy if full-term delivery would have occurred or would occur after nine (9) months of continuous membership.

\* \* \* \* \* \*

### III. HOSPITAL SERVICES AND OTHER BENEFITS

#### A. INPATIENT CARE.

\* \* \* \* \* \*

4. Maternity benefits. Maternity care, as defined, to the extent specified in the Schedule of Benefits.

The Blue Shield Membership Certificate provides:

### I. DEFINITIONS

\* \* \* \* \* \*

K. OBSTETRICAL SERVICES as used herein means the services of a physician required and rendered in connection with delivery (childbirth) and for the care of any condition resulting from pregnancy or delivery. Obstetrical services shall be provided only for the member or, in the case of a family-type membership, the member's spouse. No obstetrical services shall be available until the eligible participant has been in good standing for a continuous period of nine months next preceding the date of care for such services. This waiting period shall not apply in premature termination of pregnancy if delivery at term would have occurred after nine months of continuous Membership.

\* \* \* \* \* \*

### III. BENEFITS AND SERVICES

\* \* \* \* \* \*

### C. SERVICES FOR WHICH BENEFITS ARE PROVIDED.

\* \* \* \* \* \*

7. Obstetrical Services as defined in Article I.K. rendered and billed for by the physician in charge of the case. Benefits for Obstetrical Services shall not be available unless and until this membership and any other Blue Shield membership providing such benefits for the participant has been continuously in effect for 9 months next preceding the date of care. The waiting period shall not apply in premature termination of pregnancy if delivery at term would have occurred after 9 months of continuous membership.

A six page brochure, furnished by appellants to members of the Bar Association, explaining the program, provides:

### BLUE CROSS BENEFITS FOR HOSPITAL SERVICES

MATERNITY BENEFITS: In hospital benefits are the same as for other admissions for member or spouse and newborn. Includes delivery room and ordinary nursery care for newborn during the mother's stay and treatment for conditions arising from pregnancy.

\* \* \* \* \* \*

### BLUE SHIELD BENEFITS FOR PHYSICIANS' SERVICES

BLUE SHIELD benefits protect members and their families against the primary costs of ... maternity care, paying the FULL amount of the usual, customary and reasonable charges for covered physicians' services for: ....

OBSTETRICAL SERVICES, including prenatal and post-partum care, and treatment of conditions resulting from pregnancy or delivery are available to the member or spouse.

■ Appellants argue that the advertising brochure is not part of the contract sued upon. When the brochure is read

together with the other documents it becomes apparent that the brochure contains provisions found nowhere else which are essential to a complete contract. The brochure represents that Blue Shield benefits protect members and their families against the primary costs of maternity, including prenatal and post-partum care, and treatment of conditions resulting from pregnancy or delivery; no such provision is found in the Blue Shield membership certificate. The brochure also defines Blue Cross maternity benefits to include treatment for conditions arising from pregnancy. Appellants argue that there is no substantial difference between the language used in the brochure and that used in the certificate. Where the provisions pertaining to maternity benefits are ambiguous they will be construed against the insurer. *Robin v. Blue Cross Hosptial Serv., Inc.,* 637 S.W.2d 695, 698 (Mo. banc 1982). Accordingly, this Court holds that the brochure constitutes a part of the insuring agreement. *See Lutsky v. Blue Cross Hospital Serv. Inc.,* 695 S.W.2d at 873; *Crawford v. Mid-America Ins. Co.,* 488 S.W.2d 255, 259 (Mo.App.1972).

■ Like *Blue Cross-Blue Shield, Inc. v. Turner,* the policy is replete with words such as "prenatal and post-partum care," "maternity care," "obstetrical cases," "pregnancy," "resulting from," and "arising out of." The Blue Shield certificate provides that services for which benefits are available include not only services connected with childbirth, but the care of any condition resulting from pregnancy or delivery. The Blue Cross certificate provides for hospital care in obstetrical cases, including any illness resulting from pregnancy and delivery and after care. And the brochure provides for treatment for conditions arising from pregnancy.

These maternity care provisions are not susceptible to appellants' interpretation limiting the liability to the event of childbirth alone. This policy is similar to that of *Turner's* and *Blissenbach's* to the extent that liability arose with the pregnancy.

Under the terms of the policy the Behrs' membership was required to be in good standing for a continuous period of 9 months preceding the date of admission to the hospital. The requirement of a waiting period in most, if not all, hospital service programs which include maternity care prevented the Behrs at the time of cancellation from obtaining similar protection elsewhere. *Turner,* 195 So.2d at 811. Such a waiting period affords appellants an opportunity to set its premiums using an actuarial loading factor to cover anticipated maternity benefits. Further, the provisions for maternity services and benefits cover pregnancy foreshortened by premature termination. It would be ironic to say that if Mrs. Behr had induced labor prior to September 28, 1983, the Behrs would have been entitled to benefits; but because she elected to carry to full term and delivered on October 4, 1983, the policy has lapsed by virtue of cancellation. This Court will not now hold that appellants can require an insured to wait 9 months and then be permitted under the representations of this policy to modify or terminate coverage prior to delivery. *See Brown v. Blue Cross & Blue Shield, Inc.,* 427 So.2d 139 (Miss. 1983).

This Court recognizes that the type of coverage provided by appellants is generally one for health and medical services incurred and charged during the life of the policy. *See generally* Annot. *Elimination of Particular Coverage,* 66 A.L.R.3d 1205, 1208–1209 (1975). *See also Lutsky,* 695 S.W.2d at 874[4]. However, under the language of the maternity provisions in this policy, the event insured against was pregnancy; the Behr pregnancy commenced prior to cancellation of the policy. This Court holds, therefore, that liability attached prior to September 28, 1983, and the insurer is not relieved from liability under the contract. *Kingsland v. Missouri State Life Ins. Co.,* 66 S.W.2d at 961; *see also Myers v. Kitsap Physicians Serv.,* 78 Wash.2d 286, 474 P.2d 109, (1970); *Danzig v. Dikman,* 78 A.D.2d 303, 434 N.Y.S.2d 217 (1980), *aff'd* 53 N.Y.2d 926, 440 N.Y.S.2d 925, 423 N.E.2d 402 (1981).

This result is consistent with *Lutsky v. Blue Cross Hospital Serv., Inc.*, where the plaintiff was covered by a group health care plan provided by defendants. A claim for hospital and medical care expenses was instituted on October 8, 1981, and the insurer made payments according to the terms of the policy, which provided for $1,000,000 lifetime benefits per person, until it was changed when the hospitalization benefit was amended to provide an annual maximum of $5,000 and a lifetime maximum of $25,000. This Court held that a new limit below $1,000,000 in lifetime benefits per person could not be imposed on benefits available for illness requiring hospitalization and having its inception while the $1,000,000 limitation was in effect. This Court also found provision of the insurance contract, supplemented by provisions contained in advertising brochures, to be at least ambiguous and therefore resolved the ambiguity in favor of the insured. *Lutsky*, 695 S.W.2d at 870.

If a contract promises something at one point and takes it away at another there is an ambiguity. *Lutsky*, 695 S.W.2d at 875. Here certain provisions, relied on by the Behrs, provide pregnancy benefits to members in good standing once the waiting period has expired; other provisions cited by appellants attempt to negate this coverage. Again, if the ambiguity is in an insurance contract it will be construed against the insurer. *Robin v. Blue Cross Hospital Serv., Inc.*, 637 S.W.2d at 698. Thus any provisions of the policy which standing alone might support insurers' contentions are ineffective to limit coverage for maternity care under the high option program once liability has become fixed. *See Lutsky*, 695 S.W.2d at 875.

Appellants rely on *Robin v. Blue Cross Hospital Serv., Inc.*, where this Court considered a group health plan to determine what benefit the plan intended to provide. There the plaintiff's accidental injuries resulted in her loss of employment; consequently, the dues required by the group hospital service plans were no longer paid by her former employer. The plaintiff failed to exercise her privilege of conversion to individual coverage after termination of her group coverage and therefore failed to keep the agreement in force. This Court held that the provisions of the contract providing that continued membership was necessary to maintain coverage were clear, unambiguous, and enforceable and were not inconsistent with any other provisions of the contract. *Robin*, 637 S.W.2d at 699. The case is fully distinguishable. *See Lutsky*, 695 S.W.2d at 876–877.

The judgment is affirmed.

BILLINGS, BLACKMAR and RENDLEN, JJ., concur.

DONNELLY and ROBERTSON, JJ., dissent.

WELLIVER, J., dissents in separate opinion filed.

WELLIVER, Judge, dissenting.

I respectfully dissent.

Recognizing the futility of writing, *Lutsky v. Blue Cross Hosp. Serv., Inc.*, 695 S.W.2d 870, 877 (Welliver, J. dissenting), I simply state again that I cannot participate in any further rewriting of the Blue Cross-Blue Shield service contract and the resulting escalation of the cost of medical care and treatment.

I find it extremely difficult to say that we should approve this lawyer-plaintiff to advise the public, among other things, on the interpretation of contracts; and, that at the same time we must treat him and the lawyer association of which he is a member as an innocent member of the public who has been misled and deceived by that horrible monster Blue Cross, with whom they chose to contract.

Because he is one of ours, we give him free of charge that for which he testified he offered and that for which he was willing to pay extra.[1]

---

1. Respondent testified:

Okay. And in it, it indicates what I said, that we're no longer 100 percent covered, it's

now a 20/80 program with a $300 deductible.

First thing I do is call the Bar Association and ask them about it, tell them about my situation, and they tell me to call William Prichard.

I call Mr. Prichard and talk to him about it, and I even advised him that since they had extended the program a month beforehand,

and we had paid for that portion of the program, *I would be willing to pay another month for that same program, at the higher rate, so we had continued coverage.*

He says, "No, we're not doing anything. The plan is over with, that's the end of it." (Emphasis added).