CONTINENTAL CASUALTY
COMPANY, Appellant,

v.

Cora SMITH, Appellee.

Court of Appeals of Kentucky.

June 13, 1980.

James D. Ishmael, Jr., Brown, Sledd & McCann, P.S.C., Lexington, for appellant.

Nick Benson, Rouse & Benson, Walton, for appellee.

Before HAYES, C. J., and LESTER and VANCE, JJ.

LESTER, Judge.*

This is an appeal from a judgment entered on a jury verdict determining that appellee was entitled to benefits under a policy of insurance which provided certain disability payments in connection with her occupation. The type of contract involved is sometimes referred to as personal income protection.

Milton and Cora Smith operated a modest floral shop out of a portion of their residence in Dry Ridge. They were partners and owners and their son, Tony, was an employee. The couple both belonged to the Florists' Transworld Delivery Association (FTD) which was a trade group designed to promote the interests of the industry and to facilitate long distance flower orders. FTD negotiated a master contract of insurance with appellant whereby participating members of the association could apply for a monthly indemnity of $100 to $1000 of the individual's income in the event of disability occasioned by a covered injury or disease.

In furtherance of the program, the carrier sent certain solicitations and advertisements to FTD members which purported to describe the insurance and the several plans thereof, together with the amount of benefits and premium costs. No agents or salespeople called upon appellee, so there is no issue of oral representations concerning the policy. On October 22, 1974, Cora filed her application for the $1000 monthly benefit plan and in so doing, she answered the following question in the negative:

Does the indemnity for loss of time herein applied for together with all other income protection policies you have or are applying for exceed 75% of your wage or salary.

In April of 1975, Cora sustained a disabling accident and Continental started paying her benefits ($1000 per month) for the next thirteen months. During that period, it never caused an investigation of either her application or her claim, but did continue accepting her premiums during the last seven of the thirteen months in spite of the language in its solicitation material to the effect:

After a six month period of total disability, the payment of premiums will be waived and your coverage continued for as long as you continue to receive benefits for that disability.

On July 23, 1976, after an inspection of the Smith tax returns, appellant notified Cora that it was rescinding the contract because it discovered that contrary to what the insured stated in her application, the benefits she requested did in fact exceed 75% "of your wage or salary." Simultaneously, Continental demanded repayment of $13,000 it had paid less the total of the premiums. On December 3, 1976, Cora Smith filed her complaint demanding that the policy benefits be made current and continued for the remainder of her life due to her permanent and total disability.

At the conclusion of the evidence, certain interrogatories were given to the jury in response to which they found that even though the appellee's answer to the question hereinabove set forth was substantially untrue, that she did not know it was false, nor intend it to mislead or deceive. The jury thought appellant would not have accepted the application if Cora had answered affirmatively. The panel further considered it the duty of the carrier to so construct its solicitations, pamphlets, fliers and policy applications in such a manner so as to fairly portray the representations and assurances contained in the policy itself and in this case, it did so in such a manner as to cause or induce Cora to believe that gross business income was to be insured by the policy. The jury then found appellee to be wholly and continuously disabled on a permanent basis.

Relying upon the jury's determination that Cora's answer upon the application was "substantially untrue," although not intentionally made, and that the company would not have issued the policy if it had

---

* This case was assigned and argued prior to the May 1, 1980 amendment to SCR 1.030(7)(b).

been aware of the true state of the florist shop's financial affairs, appellant maintains it was entitled to a judgment notwithstanding the verdict by virtue of the provisions of KRS 304.14–110. That statute bars recovery on a policy where the misrepresentations are material or the insurer would not in good faith have issued the contract if the actual facts had been made known to it in the application. Appellee counters that even granted what the company argues, if the erroneous answer is induced or made in reliance upon misleading information provided the applicant by the carrier, then the policy cannot be avoided on the basis of the incorrect statement. In other words, Cora argues estoppel.

■ We now return to the facts. In answer to the question:

> Once again, Cora, answer the question that was previously asked. How did you interpret this question about your wage or salary? What did it mean to you?
>
> A. We were not on a wage or salary.
> Q. What did you think they meant?
> A. The income of the business. That's the only income that we had.

This Court has examined the various materials prepared and distributed by appellant and throughout all of it, repeated references are made in bold type to "income protection" and "income protection plan." It further states that "all eligible members and employees who apply are guaranteed acceptance..." which implies that other applicants are eligible besides employees. If nothing else, these quotations certainly create an ambiguity as to appellee.

Much is made of the distinction between gross and net income in the record and the court excluded any evidence of the former beyond the testimony that the business grossed $42,000 in the last full year (1973) before the policy was applied for in 1974. The trial court was probably correct, but the crux of the issue is what did Cora believe she was protecting when she requested the insurance. She did not receive nor had she ever received a salary from the business. Cora and Milton lived out of

what they took in so it is logical that she believed she was protecting her total income, especially in light of the ambiguous language of the solicitation material.

■ Since the determination of whether an insurance applicant was, through ignorance and good faith, misled by a company's agent into believing the answers were truthful is for a jury to decide, *Metropolitan Life Ins. Co. v. Trunick's Adm'r*, 246 Ky. 240, 54 S.W.2d 917 (1932), then we shall not upset the panel's determination in this cause to the effect that appellee answered the question "not with a knowledge of its falsity, nor with the intention to mislead or deceive the defendant company." This being true, then the various principles enunciated in *Pennsylvania Life Insurance Co. v. McReynolds*, Ky., 440 S.W.2d 275 (1969), that are applicable to nonmedical health and accident insurance would prevail. This last cited case modified an existing rule and held that no longer would the full responsibility for the correctness of an application be placed upon the insured except where that applicant inserts the answers. However, whether he knows the falsity of the replies depends on how fully he understands exactly what information is being sought. That same opinion, *Pennsylvania Life Ins. Co.*, reiterates and affirms the law of *Sovereign Camp, W.O.W. v. Alcock*, 273 Ky. 734, 117 S.W.2d 938 (1938), to the effect:

> [I]n the case of insurance contracts it is the fixed rule that the insurer will be estopped to deny liability on a policy if its agent inserts false statements in the written application, or by misleading statements induces the insured to make false answers, if the insured is acting in good faith....

■ Appellant seeks to distinguish the cases from the one at bar by stating that they deal with misrepresentations by an agent while here there is no such intervening element. We fail to see a distinction between an inducement or misleading representation made by an agent and one made by the company itself in the form of printed material sent to the applicant. This is a

distinction without a difference. The circuit court was correct in overruling the motion for a judgment notwithstanding the verdict.

■ Appellant next contends that where the promotional material was sent to the potential insurance applicant prior to the execution of the application which were not referred to or attached to the policy, then they were not part of the contract and therefore, not a proper subject for instruction by the court. It must be remembered that appellee had nothing before her except the solicitation documents prepared and sent to her by appellant. Not only were they the inducement for requesting the insurance, but under the evidence, they were the *sole* inducement. Without them, she would not have been aware of the several plans for income protection. In this case, as in *Southern Mutual Life Insurance Company v. Montague*, 84 Ky. 653, 2 S.W. 443 (1887) and *SEG Employees Credit Union v. Scott*, Ky.App., 554 S.W.2d 402 (1977), the pamphlets or fliers were the inducement for the applicant to seek the insurance and pay the premium and as such formed a part of the consideration and accordingly, became part of the policy. To hold otherwise "would be sustaining a fraud that no court of conscience could sanction." *Southern Mutual Life Ins. Co., supra.* Therefore, the instruction was proper.

Appellant would have us distinguish the *Southern Mutual Life* case from the present litigation on the fact that in the cited opinion there was an agent exhibiting materials to the customer while no representative called upon appellee. Again, we express our view that we see no distinction between an agent showing printed matter to a prospective customer or a carrier sending it through the mail to the insured.

Appellant's final contention disputes the sufficiency of the medical evidence to establish a total and permanent disability, but even in the event that it did so successfully, the benefits should not be payable subsequent to March 25, 1977. It was on this date that one of her doctors (Dr. Stevens) released her to return to work. We will review the salient points of appellee's medical problems.

It was in 1975 that Cora Smith fractured her tailbone and it was for this injury that she applied for and received benefits. Later on, during the same year, she reinjured the coccyx as well as her left shoulder and neck. Doctors Air and Hess were the attending physicians for these initial problems. In June of 1976, Dr. Hess diagnosed an arthritic condition in Cora's right foot for which Dr. Stevens operated. His diagnosis at the time was tenosynovitis, but at the time he considered rheumatoid arthritis as a possible cause. Two days after the surgery, the master policy between Continental and FTD was cancelled. Cora's condition (arthritis) now extends to her jaw, neck, right shoulder, elbow, wrist and the fingers on both hands, in addition to her continually painful tailbone condition. It is true that when *first* deposed, Dr. Stevens released Mrs. Smith to return to work upon the basis of the rheumatoid problems alone, but in his *second* deposition, he reversed that opinion and considered her unable to perform her usual work in the floral shop. We think the most succinct statement concerning Mrs. Smith's prognosis came from Dr. Hess who said:

> Her future is very bleak if this follows my experience with rheumatoid arthritis she will slowly and progressively become worse probably to the extent of a wheelchair.

■ The medical evidence in this cause reflects a fractured coccyx followed by ankle surgery with the subsequent development of rheumatoid arthritis supporting the jury's determination of "wholly and continuously disabled" on a permanent basis, all of which commenced prior to the cancellation of the insurance contract. We neither believe the evidence to be insufficient, nor will we invade the province of the jury.

The judgment is affirmed.

All concur.