**F I L E D**
United States Court of Appeals
Tenth Circuit

MAR 3 1998

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

FRANCIS D. BROWN; MICHAEL A.
OLSEN; and KIRK D. SMITH, Wyoming
residents, suing on behalf of themselves
and all other individuals similarly situated,

     Plaintiffs-Appellants,

v.

ROYAL MACCABEES LIFE
INSURANCE COMPANY, a Michigan
Corporation, and a member of Royal
Insurance Group,

     Defendant-Appellee.

No. 96-8119

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 95-CV-45)**

---

Glenn E. Smith, Glenn E. Smith & Associates, Cheyenne, Wyoming, for Plaintiffs-Appellants.

Keith R. Verges (Mark T. Davenport, Figari & Davenport, L.L.P., Dallas, Texas; and William M. McKellar and Peter K. Michael, Boley & McKellar, P.C., Cheyenne, Wyoming, with him on the briefs), Figari & Davenport, L.L.P., Dallas, Texas, for Defendant-Appellee.

---

Before **PORFILIO**, **MCKAY,** and **LUCERO**, Circuit Judges.

**PORFILIO**, Circuit Judge.

_____

Francis Brown, Michael Olsen, and Kirk Smith, named plaintiffs in an uncertified class action,[1] appeal a district court order granting summary judgment for defendant Royal Maccabees Life Insurance Company (Maccabees). This appeal requires us to answer the following question of state law:

> Under Wyoming law, is an illustration used to sell a universal life insurance
>
> policy considered part of the insurance contract when the illustration and
>
> the policy contain conflicting provisions and the insured party relied on the
>
> illustration in entering the insurance contract?

We must also determine whether, under Wyoming law, the provisions of a Maccabees insurance policy control over the provisions contained in an illustration used to sell the policy. Finally, given the undisputed facts presented here, we must determine whether, under Wyoming law, Maccabees is estopped from asserting certain provisions of a universal life insurance policy, based on plaintiffs' alleged detrimental reliance on the provisions of an illustration used to sell the policy. We ultimately conclude (1) an illustration is not considered part of an insurance contract under Wyoming law simply because the insured party relied on the illustration in entering the insurance contract and

_____

[1]The parties agreed to postpone certification pending resolution of the contract issues discussed in this opinion.

- 2 -

the policy and illustration contain conflicting provisions; (2) the provisions of the Maccabees insurance policy control over the provisions of the illustration used to sell the policy; and (3) Maccabees is not estopped from enforcing the provisions of the insurance policy. We therefore affirm the district court's order granting summary judgment for Maccabees.

## I. BACKGROUND

Maccabees sold a universal life insurance policy known as the Diplomat,[2] which required an initial premium payment of approximately $8,000 and provided a Specified Benefit Amount of $1,000,000. The policy further provided "[a]ny decrease in the Specified Benefit Amount during the first ten Policy Years or during the ten year period after an increase will be subject to a pro-rata Surrender Charge." According to the policy's terms, the Accumulated Value would *increase* on a periodic basis by the amount of any additional premiums paid and by any periodic interest earned and *decrease* by the periodic cost of maintaining the Specified Benefit Amount and by the amount of any Surrender Charges which might be imposed. As with most universal life insurance

---

[2]A universal life insurance policy explicitly separates death benefit and investment functions. Premium payments on the policy therefore serve two purposes. The premiums are applied first to the cost of maintaining the stated death benefit coverage. Any remaining funds are applied to a separate account, constituting the "accumulated value" of the policy, and the insured earns a yearly interest upon the funds in the accumulated value portion of the policy. During the life of the policy, the insured may return the policy to the insurer and obtain the accumulated value, less any surrender charges or other fees for which the policy provides. *See generally* Eric M. Holmes & Mark S. Rhodes, **Holmes's Appleman on Insurance** § 1.25, at 128 (2d ed. 1996).

policies, the insured was entitled to surrender the policy in full at any time for the Accumulated Value of the policy minus any Surrender Charges or other fees associated with the surrender. The policy also permitted the insured to reduce the Specified Benefit Amount, subject to a "pro-rata" Surrender Charge against the Accumulated Value of the policy.

To assist its sales agents in illustrating the Diplomat's performance, Maccabees developed a computer program which could provide an individualized projection, based on a potential buyer's particular actuarial situation. The program generated a table projecting the Accumulated Value, Surrender Value, and Death Benefit provided each year by the policy under an assumed interest and a guaranteed interest. Although the program correctly accounted for a Surrender Charge upon total surrender of the policy, it contained a programming error and failed to reflect the pro-rata Surrender Charge upon coverage reduction expressly described in the policy.

A Wyoming insurance agency (the Agent) enlisted this programming flaw in its sales efforts[3] and generated policy projections and illustrations for its customers representing an extremely favorable performance by the Diplomat policy. Because the program did not levy a coverage reduction Surrender Charge against the policy's Accumulated Value, it was possible to create policy illustrations which reflected a

---

[3]The insurance agency, an authorized Maccabees agent, is not a party in this action. For purposes of this appeal, we have assumed plaintiffs' allegations regarding the Agent's conduct are true.

coverage reduction from $1,000,000 to $50,000 in the second year, a $50,000 death benefit coverage for fourteen years thereafter, and an ultimate Surrender Value of approximately $14,000 in the fifteenth year. If the program had imposed a Surrender Charge in the manner which Maccabees contends the policy provides, the computer-generated illustrations would have reflected a complete depletion of Accumulated Value upon the coverage reduction in the second year and a subsequent lapse in coverage absent additional premium payments.

The Agent used the favorable computer-generated illustrations to sell Diplomat policies to each of the plaintiffs in this action. In addition, the Agent offered each plaintiff a financing arrangement, under which the plaintiff would pay the initial premium, the Agent would subsequently loan the plaintiff an amount equivalent to the premium paid, and the plaintiff would correspondingly give the Agent a nonrecourse note, securing the loan solely with the Diplomat policy. As the plaintiffs understood the arrangement, if they reduced their coverage in the second year, as described in the illustrations, no further premiums were required to maintain the $50,000 death benefit, thus they could surrender the policy at the end of fifteen years, and obtain sufficient funds to repay the Agent for the nonrecourse loan. The ultimate effect of the arrangement was to give the plaintiffs $50,000 worth of life insurance for fifteen years, "free of charge," with no personal liability on the loan. One hundred and twenty people, the putative class action plaintiffs in this case, purchased Diplomat policies from the Agent on these terms.

Each plaintiff completed applications for the Diplomat policy, which the Agent forwarded to Maccabees.  After the applications were approved, each plaintiff received a copy of the policy containing a cover letter which stated "This Policy is a legal contract between the Policy Owner and the Company . . . . READ YOUR POLICY CAREFULLY."  The cover letter also informed each plaintiff  he or she had a "**TEN DAY RIGHT TO EXAMINE POLICY**" and return it if they were not satisfied.  An attached page entitled "SCHEDULE OF BENEFITS AND INITIAL MONTHLY EXPENSE CHARGES" indicated the "FIRST YEAR SURRENDER CHARGE" would be $20,350.  Finally, the Policy contained an integration clause entitled "**THE CONTRACT,**" which provided:

> This Policy, the attached application for this Policy, any attached riders, any additional applications for increases in the Specified Benefit Amount, and any Specification Endorsements make up the entire contract between the parties.
>         ....
> Any change or waiver of any provision of this Policy must be in writing and signed by an officer of the Company."

Plaintiffs admit they did not read their policies upon receipt and did not avail themselves of the ten day examination period.

A year later, plaintiffs, through the Agent, began to submit coverage reduction requests to Maccabees (in accordance with the computer-generated illustrations).   For the first several reduction requests, the Agent told Maccabees the insured parties wished to reduce their coverage because they had financial difficulties.  Maccabees imposed a

nominal $100 Surrender Charge for the first ten reductions. However, upon recognizing that an unusually high number of reduction requests were coming through the same Agent, Maccabees began applying the full coverage reduction Surrender Charge pursuant to the policy provisions, retroactively applying the charge to the initial ten reduction requests as well. The Surrender Charges consumed the Accumulated Values in the policies and, because no additional premiums were paid to maintain the death benefit coverage, the policies lapsed.

Plaintiffs brought a class action suit and agreed to submit the central contract issues in the case to the district court prior to seeking certification. The district court granted summary judgment for Maccabees, holding the illustrations were not part of the contract between the plaintiffs and Maccabees and holding the use of illustrations to sell the policies did not estop Maccabees from imposing the pro-rata Surrender Charges. Plaintiffs appeal this order.

## II. DISCUSSION

### A. Plaintiffs' Claims On Appeal

We review a summary judgment order de novo, applying the same standard used by the district court. *Osgood v. State Farm Mut. Auto. Ins. Co.*, 848 F.2d 141, 143 (10th Cir. 1988). The parties agree there are no disputed issues of fact, therefore, we must affirm the district court's order if Maccabees is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c) (Summary judgment "shall be rendered [if the record shows] there is

no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law."). Because this is a diversity action, the issues before us are governed by Wyoming law, and we must apply Wyoming law or, if Wyoming law is silent, rule as we believe the Wyoming Supreme Court would rule. *Fields v. Farmers Ins. Co.*, 18 F.3d 831, 834 (10th Cir. 1994). We conclude Maccabees is entitled to judgment as a matter of law and therefore affirm.

Plaintiffs allege they relied on Maccabees' illustrations when they purchased the life insurance policies and believed Maccabees would not impose a Surrender Charge if they chose subsequently to reduce their Specified Benefit Amount. Plaintiffs argue "insurers are bound by inaccurate or misleading policy illustrations, brochures, pamphlets, advertising material, or other sales aids if they are relied upon by the insured to purchase a policy of insurance, in spite of contrary language set forth in the policy." Plaintiffs provide no Wyoming or Tenth Circuit precedent to support this claim; rather, they cite over fifteen cases from other jurisdictions, each holding, on various grounds of contract and estoppel, an insurer was bound by the provisions of promotional materials used in the sale of an insurance policy. *Vogel v. American Warranty Home Serv.*, 695 F.2d 877 (5th Cir. 1983) (applying Mississippi law); *Leonard v. Cuna Mut. Ins. Co.*, 665 F. Supp. 759 (W.D. Mo. 1987) (applying Missouri law); *Sparks v. Republic Nat'l Life Ins. Co.*, 647 P.2d 1127 (Ariz. 1982); *Providential Life Ins. Co. v. Clem*, 403 S.W.2d 68 (Ark. 1966); *Lawrence v. Providential Life Ins. Co.*, 385 S.W.2d 396 (Ark. 1965); *Lewis*

*v. Continental Life & Accident Co.*, 461 P.2d 243 (Idaho 1969)*; Jensen v. USAA Property & Cas. Ins. Co.*, 614 N.E.2d 1361 (Ill. App. Ct. 1993); *Dobosz v. State Farm Fire & Cas. Co.*, 458 N.E.2d 611 (Ill. App. Ct. 1983); *Palsce v. Guarantee Trust Life Ins. Co.*, 588 N.E.2d 525 (Ind. 1992); *Continental Cas. Co. v. Smith*, 617 S.W.2d 48 (Ky. 1980); *Aker v. Sabatier*, 200 So.2d 94 (La. 1967); *Behr v. Blue Cross Hosp. Serv. Inc.*, 715 S.W.2d 251 (Mo. 1986); *General American Life Ins. Co. v. Barrett*, 847 S.W.2d 125 (Mo. Ct. App. 1993); *Morris v. Travelers Ins. Co.*, 546 S.W.2d 477 (Mo. Ct. App. 1977); *Crawford v. Mid-America Ins. Co.*, 488 S.W.2d 255 (Mo. Ct. App. 1972); *Weinberg v. Insurance Co.*, 388 N.Y.S.2d 69 (N.Y. App. Div. 1976); *Craver v. Union Fidelity Life Ins. Co.*, 298 N.E.2d 918 (Ct. C.P. Ohio 1973); *Barth v. State Farm Fire & Cas. Co.*, 257 A.2d 671 (Super. Ct. Pa. 1969); *Romano v. New England Mut. Life Ins. Co.*, 362 S.E.2d 334 (W. Va. 1987). As the plaintiffs' extensive list of authorities indicates, there is indeed a "growing trend in the law to give binding effect to sales and promotional materials provided to insureds by the insurer." *Romano,* 362 S.E.2d at 339-40. However, our duty is not to blindly follow this growing trend or even to evaluate the trend's merits. Instead, we must determine whether the Wyoming Supreme Court would find the cited cases persuasive and choose to follow the trend.

Plaintiffs also present contract and estoppel claims. In their contract claims, plaintiffs argue the illustrations must be considered part of the insurance contract and contend, because courts traditionally construe contracts against the party drafting the

agreement, the illustration's no-surrender charge depiction must control over the Surrender Charge provisions of the policy. In their estoppel claims, plaintiffs assert the illustrations represent a clear and definite agreement between the parties to enter into an insurance contract without Surrender Charges, and because the plaintiffs reasonably relied on this agreement, Maccabees is estopped from enforcing the pro-rata coverage reduction Surrender Charges provided in the policy. Plaintiffs are not suing in tort, nor do they seek monetary damages; rather, plaintiffs seek specific performance of the contract in accordance with their proffered interpretation of the illustrations' terms.

### B. Applicable Wyoming Law

We begin our discussion by examining applicable Wyoming law. First, we consider ***Poling v. North American Life & Cas. Co.***, 593 P.2d 568 (1979)**,** which involved a factual setting and an argument similar to the one plaintiffs present here. Second, we identify the Wyoming rules of construction applicable to insurance contracts.

### 1. Poling v. North American Life & Cas. Co.

The central question in ***Poling*** was "whether a certificate of insurance furnished to an insured under a group policy for credit life insurance should control over the provisions of the policy if the terms of the two instruments conflict." ***Poling***, 593 P.2d at 569. Mrs. Poling, the beneficiary of a group insurance policy, claimed a certificate of insurance contained a liberal provision regarding the coverage allowed in the event the insured person committed suicide. Mrs. Poling contended both the master policy *and* the

- 10 -

certificate of insurance comprised the contract between the parties and "rules of contract construction entitle[d] her to the most favorable interpretation," namely, enforcement of the more liberal representation found in the certificate. *Id.* at 572. The certificate of insurance, however, contained a disclaimer which specifically stated the certificate was not part of the insurance contract. In addition, the master policy contained an integration clause providing "This Policy and the application of the Policyholder, ... and the applications, if any, of the Insured Persons, will constitute the entire contract between the parties." *Id.* at 569. The master policy also contained a corollary provision, reiterating the certificate's disclaimer: "[A] Certificate will not constitute a part of this Policy nor will it change, modify or invalidate any of the terms and conditions of this Policy." *Id.* at 568. The Wyoming Supreme Court rejected Mrs. Poling's argument and held the certificate of insurance was not part of the insurance contract and the provision in the certificate would not control over the conflicting provisions of the master policy:

> We adopt ... the rule that the certificate of insurance is evidence of coverage only. [citing cases]. In this regard it is important to note that the certificate of insurance ... provides in part as follows:
>> ... Certificates ... will not constitute a policy nor change, modify or invalidate any of the terms or conditions of the Group Policy.
> Given the previously quoted [integration clause and disclaimer] of the master insurance policy, we hold that in such a situation any conflict between the terms of the certificate and the master policy results in the terms of the master policy being applied to determine the rights and obligations of the parties.

*Id.* at 572 (citations omitted).

Although we recognize ***Poling*** is not dispositive in this case, we believe ***Poling*** provides important guideposts for our inquiry. First, ***Poling*** clearly holds a certificate of insurance will not control over a master policy in the group insurance context, and, to the extent plaintiffs' cases hold to the contrary, we are justified in finding them unpersuasive. *See **Leonard***, 665 F. Supp. at 763 (holding provisions of certificate of insurance controlled over provisions of group life insurance master policy); ***Morris***, 546 S.W.2d at 486 (same). Second, given ***Poling*** reflects an unwillingness to provide special consideration for the group insurance context, to the extent plaintiffs' cited cases involve a group insurance context, we should approach them with caution. *See **Clem***, 403 S.W.2d at 69 (application and student group insurance policy); ***Lawrence***, 385 S.W.2d at 938 (pamphlet and student group insurance policy); ***Lewis***, 461 P.2d at 247-48 (explanatory booklet and group life insurance policy); ***Palsce***, 588 N.E.2d at 527 (brochure and student group insurance policy); ***Smith***, 617 S.W.2d at 51 (promotional material and group income protection insurance); ***Crawford***, 488 S.W.2d at 260 (application and student group insurance policy); ***Romano***, 362 S.E.2d at 340 (promotional materials and group life insurance policy). Finally, given ***Poling***'s express reliance on the policy's integration clause in excluding the certificate of insurance from the insurance contract, we believe we must attach similar weight to the Diplomat's integration clause. [4]

---

[4]Plaintiffs argue ***Poling*** is inapposite because the illustrations in this case do not contain an express disclaimer, such as the disclaimer in ***Poling.*** Plaintiffs, however, overstate the ***Poling*** court's reliance on the certificate's disclaimer. In reaching its

(continued...)

- 12 -

## 2. Wyoming Rules of Construction for Insurance Contracts

Wyoming law instructs us to construe insurance policies according to the traditional rules of contract construction. ***Doctors' Co. v. Insurance Corp.***, 864 P.2d 1018, 1023 (Wyo. 1993) ("Our established rules of contract interpretation apply to insurance policies."); ***St. Paul Fire & Marine Ins. Co. v. Albany County Sch. Dist.***, 763 P.2d 1255, 1257 (Wyo. 1988) ("An insurance policy is a contract, and the general rules of contract construction apply to insurance agreements."). Under these rules of construction,

> the parties have the right to employ whatever lawful terms they wish and the courts will not rewrite them. In other words, the terms must not conflict with pertinent statutes or public policy. Such [insurance] contracts should not be so strictly construed as to thwart the general object of the insurance. To this should be added the concept that the words used will be given their common and ordinary meaning. The intention of the parties is the primary consideration and is to be ascertained, if possible, from the language employed in the policy, viewed in the light of what the parties must reasonably have intended. Absent ambiguity, there is no room for

[4](...continued)
ultimate holding — that the provisions of the master policy should control over the provisions of the certificate — the court expressly relied on the language of the master policy, i.e., the master policy's integration clause and disclaimer. *See **Poling***, 593 P.2d at 572 ("Given the previously quoted language of the master insurance policy, we hold ...."). In addition, the illustrations before us *do* contain language which would counsel caution in a reader. The illustration is titled an "*ILLUSTRATION* OF *PROJECTED* VALUES AND BENEFITS," suggesting the information provided was tentative. Each page warns the reader to "[s]ee Page 2 for essential notes explaining this *proposal*." Furthermore, the illustration notifies the reader the assumed interest rate may vary. The illustration therefore clearly communicates the idea it was *not* a contract, and the policy's integration clause clearly states that the policy itself constitutes the contract. We find ***Poling*** on point, therefore, as it relates to the role of an integration clause in the current factual setting.

construction and the policy will be enforced according to its terms.  Neither will the language be "tortured" in order to create an ambiguity.

*McKay v. Equitable Life Assur. Soc.*, 421 P.2d 166, 168 (Wyo. 1966) (internal citations omitted); *see also **Sinclair Oil Corp. v. Republic Ins. Co.***, 929 P.2d 535, 539-40 (Wyo. 1996) (quoting and reaffirming *McKay*'s insurance contract construction rules while considering certified question of law).  Under these rules, we must begin with the "language employed in the policy" and attempt to discern "the intention of the parties."

As previously noted, the Diplomat policy contains an integration clause, which identifies the policy, the application, and attached riders as the "entire contract" between the parties.  Under Wyoming's ordinary rules of insurance contract construction, our interpretation of the contract's terms would be limited to the materials identified in the Diplomat's integration clause.  Therefore, unless the cases cited by plaintiffs contain a justification which the Wyoming Supreme Court would adopt for departing from its traditional approach to an integrated contract, we cannot find the illustrations to be part of the insurance contract between the plaintiffs and Maccabees.

## C.  Are the Illustrations Part of the Insurance Contract?

Plaintiffs have identified an extensive list of authorities holding that an insurer's promotional materials are binding and control over the conflicting provisions of a policy.  These cases present three distinct rationales which might support a decision to disregard the integration clause in the present case.  We must consider each of the rationales and decide whether Wyoming would find them persuasive.

### 1. Proposed Rule #1: Insurance Contracts Require Special Rules of Construction.

The majority of the plaintiffs' cases are based on the proposition that insurance contracts are unusually complex and insured parties, as a practical matter, tend not to read their policies. These features of insurance contracting, the cases hold, justify applying a special rule of construction in the insurance context. This reasoning has been described influentially as follows:

> [F]ortunately the courts, beginning to realize the realities of the relationship between the parties, particularly that the contract as set forth [in] the insurance policy often is practicably unintelligible and generally never read, whereas brochures and other material given out by the insurer are read and relied upon, are now enforcing the contract expected by the insured, that is the contract set out in the brochure or pamphlet.

John A. Appleman & Jean Appleman, **Insurance Law & Practice** § 7534, at 130 (1976). Most of the plaintiffs' cases explicitly adopt this rationale. *See Leonard,* 665 F. Supp. at 763 (relying in part on Appleman, *supra*); *Sparks,* 647 P.2d at 1134 (citing Appleman, *supra*); *Lewis*, 461 P.2d at 245 ("[W]e have long recognized that 'it is a matter of common knowledge insurance contracts are not entered into as other contracts generally are.'"); *Jensen,* 614 N.E.2d at 1365 (following *Dobosz*); *Dobosz,* 458 N.E.2d at 614-15 ("[I]n recognition of the complications of insurance policy provisions, it is not too much to ask of the insurer who markets its policies by the use of attractive and illustrative brochures to give fairly equal prominence to exclusions and coverages. Given these principles, we construe this policy with the brochure ...."); *Palsce,* 588 N.E.2d at 526 (relying on "prominent trend" described in Appleman, *supra*, to hold provisions of

brochure controlled over provisions of master policy); *Barrett*, 847 S.W.2d at 130

(quoting Appleman, *supra*, as a description of "the reality of the relationship between

parties to an insurance contract"); *Crawford,* 488 S.W.2d at 258 (citing Appleman, *supra,*

as authority for the "modern trend" which will not permit the insurer to "assert the more

stringent provisions of the policy" when the insured relies on the representations of

promotional materials); *Weinberg,* 388 N.Y.S.2d at 70 (citing Appleman, *supra,* as

authority for the proposition, "the developing rule, adopted by the appellate courts of

other jurisdictions, is to consider the representations in the brochure as part of the

insurance contract, binding upon the insured"); *Romano,* 362 S.E.2d at 339 (citing

Appleman, *supra*).

Two of plaintiffs' cases, *Lewis v. Continental Life & Accident Co.*, 461 P.2d 243

(1969), and *Barth v. State Farm Fire & Cas. Co.*, 257 A.2d 671 (Super. Ct. Pa. 1969),

describe this rationale in particularly compelling terms. In *Lewis*, the court observed,

> "[i]nsurance policies, while in the nature of written contracts, are not
> prepared after negotiations between the parties, to embrace the terms at
> which the parties have arrived in their negotiations. They are prepared
> beforehand by the insurer, and the company solicitors then sell the
> insurance idea to the applicant. Normally, the details and provisions of the
> policy are not discussed, except that the particular form of policy is best
> suited to give the applicant the protection he seeks. If he reads the policy he
> is generally not in a position to understand its details, terms, and meaning
> except that, in the event against which he seeks insurance, the company will
> pay the stipulated sums. He seldom sees the policy until it has been issued
> and is delivered to him. He signs an application blank in which the policy
> sought is described either by form number or by a general designation, pays
> his premium, and in due course thereafter receives, either from the agent or
> through the mails, his policy. Many of its terms and all of its defenses and

- 16 -

super-refinements he has never heard of and would not understand them if he read them."

*Lewis*, 461 P.2d at 246 (quoting with approval ***Browning v. Equitable Life Assurance Soc.***, 72 P.2d 1060, 1073 (1937)). Similarly, in ***Barth***, the court quoted with approval the following passage:

"It must be presumed, ordinarily, that persons are familiar with the terms of written contracts to which they are parties, and in the absence of fraud they are justly bound by the provisions therein, but the rule should not be strictly applied to insurance policies. It is a matter almost of common knowledge that a very small percentage of policy holders are actually cognizant of the provisions of their policies and many of them are ignorant of the names of the companies issuing the said policies. The policies are prepared by the experts of the companies, they are highly technical in their phraseology, they are complicated and voluminous--the one before us covering thirteen pages of the transcript--and in their numerous conditions and stipulations furnishing what sometimes may be veritable traps for the unwary. The insured usually confides implicitly in the agent securing the insurance, and it is only just and equitable that the company should be required to call specifically to the attention of the policyholder such provisions as the one before us. The courts, while zealous to uphold legal contracts, should not sacrifice the spirit to the letter nor should they be slow to aid the confiding and innocent. ..." Indeed, "the applicant usually tells the insurer's agent of his coverage necessities and relies on the agent for a policy in accordance therewith. ... We conclude an insurance company which in its policy has written the generally broad coverage may be estopped to defend by reason of an exclusionary clause not within the terms the insured ordered and coverage which he was led to believe was contained therein."

***Barth***, 257 A.2d at 674-75 (quoting ***Farmers Mut. Auto Ins. Co. v. Bechard***, 122 N.W.2d 86 (S.D. 1963)); *see also* ***Craver v. Union Fidelity Life Ins. Co.***, 298 N.E.2d 918, 921 (Ct. C.P. Ohio 1973) (emphasizing insurance policies are "designed to be sold to

the ordinary person" and must be "given their ordinary meaning to an average person not the meaning they might have to the highly wary or to someone skilled in the law").

Wyoming precedent will not support the premise which underlies these cases, that is, the complexity of insurance policies and the insured's general failure to read his or her policy justifies special rules of construction for an insurance contract. On the contrary, the Wyoming Supreme Court has been quite firm in its refusal to accord special rules of construction for insurance policies. *See, e.g.*, **Sinclair Oil Corp.,** 929 P.2d at 539, 540 ("Our precedent in Wyoming establishes that an insurance contract is to be examined in fashion similar to any other contract.... [W]e have been consistent in holding that the usual and established rules of contract construction apply to insurance policies."); **Squillace v. Wyoming State Employees' & Officials' Group Ins. Bd.,** 933 P.2d 488, 491 (Wyo. 1997) ("An insurance policy is a contract and should be construed in accordance with general principles of contractual interpretation."). Furthermore, to the extent these cases rely on an insured's tendency not to read his or her policy, they conflict with Wyoming law which expressly imposes a duty to read on the insured. *See, e.g., **Feather v. State Farm Fire & Cas.**, 872 P.2d 1177, 1181 (Wyo. 1994) (rejecting plaintiff's claim he had been "misled" by his renewal and premium notices because he had "failed to fulfill his duty to read" them); **St. Paul Fire & Marine Ins. Co.**, 763 P.2d 1255, 1263 (Wyo. 1988) ("We will not absolve the parties to an insurance policy from the duty to read the policy."); **National Farmers Union Property & Cas. Co. v. Zuber**, 824 F. Supp. 1017,

1021 (D. Wyo. 1993) ("Wyoming law states that the insured has a duty to read his or her policy"); **Darlow v. Farmers Ins. Exch.**, 822 P.2d 820, 828-29 (Wyo. 1991) (citing **Zuber**). Given Wyoming precedent has repeatedly affirmed the rule that insurance contracts are governed by the general rules of contract construction and given Wyoming law "will not absolve the parties to an insurance contract from the duty to read the policy," we conclude the Wyoming Supreme Court would not be persuaded to consider non-policy promotional materials as part of an insurance contract simply because insurance policies tend to be complex or because insured parties generally do not read their policies.[5] Therefore, to the extent plaintiffs' proffered rule relies on these rationales, it must fail.

### 2. Proposed Rule #2: When promotional materials contain essential terms without which the policy cannot be understood, they must be considered part of the contract.

A few of plaintiffs' cited authorities hold that promotional materials will be considered part of an insurance contract when essential terms of the insurance policy cannot be understood except by reference to the express provisions of the promotional materials. *See Behr,* 715 S.W.2d at 255 ("When the brochure is read together with the other documents it becomes apparent that the brochure contains provisions found nowhere else which are essential to a complete contract," e.g., explicit examples of

---

[5]Of course, this would not apply to a person who reads the policy but does not understand it. This is not the situation here, however.

covered situations and the definition of a key term); ***Barrett***, 847 S.W.2d at 130 ("Materials supporting and explaining an insurance policy, such as the certificate and descriptive brochures, which contain essential provisions to the contract found nowhere else are considered to be part of the insurance contract."). Plaintiffs argue such a rule is applicable here because "[t]he policy illustration used to sell the Diplomat policy to each of the Plaintiffs contains vital information necessary to interpret understand, apply and implement the actual contract of insurance." In particular, plaintiffs claim the Accumulated Value of each insurance policy, the Surrender Charge to be imposed upon actual surrender, and the Surrender Charge to be imposed upon a reduction in coverage, cannot be determined by reference to the policy alone, but require reference to the illustration. According to this theory, because the illustrations are necessary to understand the essential terms of the policy, they must be considered part of the contract. We need not decide whether Wyoming would adopt a rule holding that promotional materials which contain essential terms not included in a policy are part of an insurance contract because, even under this rule, plaintiffs' argument would fail.

The Surrender Charge upon actual surrender, the pro-rata Surrender Charge upon coverage reduction, and the Accumulation Value of the Policy are each readily discernible from the policy itself. A "SCHEDULE OF BENEFITS AND INITIAL MONTHLY EXPENSE CHARGES" and a "TABLE OF GUARANTEED VALUES" were attached to each plaintiff's policy. As attached riders, these documents became part

of the policy, pursuant to the policy's integration clause. The Schedule of Benefits and the Table of Guaranteed Values provide a First-Year Surrender Charge of $20,350. Furthermore, the Table of Guaranteed Values sets forth the Maximum Surrender Charge to be imposed for each year through the first twenty years. Plaintiffs need do no more than read their policies to ascertain these amounts.

The policy also clearly defines the Surrender Charge to be paid upon a reduction in coverage:

> The Specified Benefit Amount of this Policy may be increased or decreased upon written request by the Owner subject to the following conditions:
>      .....
> 3) Any decrease in the Specified Benefit Amount during the first ten Policy Years or during the ten year period after an increase will be subject to a pro-rata Surrender Charge.

We disagree with plaintiffs' assertion this language is unclear. The passage contemplates the imposition of a pro-rata Surrender Charge upon a reduction in coverage. In other words, a reduction in coverage would result in a Surrender Charge equivalent to a pro-rated portion of the Surrender Charge which would be due upon a total surrender, i.e., the Maximum Surrender Charge. Expressed mathematically, the pro-rata Surrender Charge would be

$$\text{Surrender Charge} = \frac{\text{SBA After Reduction}}{\text{Initial SBA}} \times \text{Maximum Surrender Charge,}$$

$$\textit{where } \text{SBA} = \text{Specified Benefit Amount.}$$

Because each plaintiff was provided with the Maximum Surrender Charge to be imposed on his or her policy, and each plaintiff would know the Initial Specified Benefit Amount and the Specified Benefit Amount after a planned reduction in coverage, each plaintiff, simply by reading his or her policy, could determine the Surrender Charge to be imposed upon a reduction in coverage. The illustrations are not necessary to this determination.

Similarly, under the heading of "**ACCUMULATION VALUE**," the policy provides a detailed description of the method used to calculate the policy's monthly Accumulation Value. Each of the variables required to calculate the Accumulation Value is defined under subsequent bolded and capitalized headings. No recourse to the illustrations is required to calculate the Accumulation Value of the policy.

Finally, for those policyholders who do not wish to conduct the calculations themselves, the policy states:

> The Company will provide an illustrative report of projected future insurance Proceeds and Cash Values which will be sent to the Owner upon request. The Company may charge a reasonable fee for providing such a Report. However, the first report for each calendar year will be free of charge.

Therefore, under the policy's express terms, each plaintiff was entitled to receive upon request a yearly projection of their policy's performance at no cost to themselves. Once again, no recourse to the illustrations at issue here is required.[6]

---

[6]Plaintiffs argue the illustrations must be considered part of the contract because the previously quoted policy language expressly refers to an "illustrative report."

(continued...)

The illustrations do not contain essential terms of the insurance contract without which the policy cannot be understood. Plaintiffs' claims under this rule would therefore prove unavailing. As a result, we do not decide whether Wyoming would adopt the rule described in **Barrett** and **Behr**.

**3. Proposed Rule #3: An insurer should be estopped from asserting, as part of an insurance contract, the provisions of an insurance policy where the insured party has relied on conflicting representations contained in the insurer's promotional materials.**

Many of the cases plaintiffs cite in support of their contract claims hold an insurer is estopped from asserting provisions contained in promotional materials when the insured party has relied on the promotional materials to his or her detriment. These courts hold, in such circumstances, the provisions of the promotional materials are binding on the insurer. *See* **Vogel**, 695 F.2d at 880-81; **Clem**, 403 S.W.2d at 69-70; **Lawrence**, 385 S.W.2d at 939; **Lewis**, 461 P.2d at 245; **Dobosz**, 458 N.E.2d at 615; **Palsce**, 588 N.E.2d at 526-27; **Smith**, 617 S.W.2d at 51; **Weinberg**, 388 N.Y.S.2d at 70; **Barth**, 257 A.2d at 675-76. Plaintiffs urge us to accept these proffered authorities as persuasive support for the conclusion the illustrations in this case are a binding part of their insurance contract with Maccabees.

---

[6](...continued)

However, plaintiffs do not assert the illustrative reports referred to in the Policy are equivalent to the illustrations upon which they rely. Nor do plaintiffs assert they obtained the illustrations upon which they rely pursuant to this policy provision. This argument therefore fails.

The proffered cases, however, represent nothing more than variations on the theme of promissory estoppel. *See, e.g., **Lewis,*** 461 P.2d at 247 ("All of the elements of estoppel are present. A promise, reliance, detriment to the insured person, and consequential profit to the company. We must, therefore, [hold the insurer to the provisions of the promotional materials]."); ***Barth,*** 257 A.2d at 676 ("[T]he representations in the brochure, if they have been reasonably relied upon by the insured, may be considered terms of the contract."); ***Romano,*** 362 S.E.2d at 340 (W. Va. 1987) ("We, therefore, conclude that where an insurer provides sales or promotional materials to an insured ... which the insurer should know will be relied upon by the insured, any conflict between such materials and the master policy will be resolved in favor of the insured."). Given Wyoming has a fully developed law of promissory estoppel and given Wyoming's insistence an insurance contract be interpreted according to the language of its policy, we do not believe the Wyoming Supreme Court would hold that provisions contained in a promotional illustration become part of an insurance contract simply because an insured party relies on them in entering the contract.[7] We therefore do not consider these cases to be relevant to the issue of whether the illustrations are part of the insurance contract in this case.

---

[7]In addition, because the proffered cases do not require, as Wyoming precedent does, a "clear and definite agreement" for promissory estoppel, we do not view them as particularly persuasive or relevant to the plaintiffs' promissory estoppel claims, discussed below.

- 24 -

## D. Plaintiffs' Contract Claims

In our opinion, plaintiffs have failed to present a rationale, which the Wyoming Supreme Court would accept, for departing from Wyoming's traditional approach to integrated insurance contracts. Accordingly, we conclude the illustrations are not part of the insurance contracts between the plaintiffs and Maccabees. Therefore, we determine whether the illustrations may be considered on the ground the contracts are ambiguous regarding the imposition of a pro-rata Surrender Charge upon a planned reduction in coverage. We may consider extraneous materials to interpret an ambiguous contract provision. *St. Paul Fire & Marine Ins. Co*, 763 P.2d at 1258. However, mere disagreement between the parties as to the meaning of a contract does not create an ambiguity. *Id.*

We see no ambiguity here regarding the imposition of a Surrender Charge upon a planned reduction in coverage. The "**DEFINITIONS**" page of the policy warns the reader "[a] portion of the Surrender Charge may be deducted if ... the Specified Benefit Amount is reduced." The provision entitled "**CHANGES IN SPECIFIED BENEFIT AMOUNT**" informs the readers "[a]ny decrease in the Specified Benefit Amount ... will be subject to a pro-rata Surrender Charge." As we noted above, there is no ambiguity in this provision, and the plaintiffs could discern the meaning of these provisions simply by reading their policies. In fact, the plaintiffs readily understood these terms themselves when the passages were brought to their attention during depositions. Like the plaintiff in

- 25 -

*Feather*, 872 P.2d at 1181, plaintiffs "failed to fulfill [their] duty to read" their Policies respecting the Surrender Charge issue. Because there is no ambiguity in the Diplomat policy regarding the presence or amount of a Surrender Charge to be imposed upon a reduction in coverage, we hold the illustrations may not be considered for the purpose of interpreting the insurance contract on the Surrender Charge issue. *McKay,* 421 P.2d at 168 ("Absent ambiguity, ... the policy will be enforced according to its terms.").

### D. Plaintiffs' Promissory Estoppel Claims

Under Wyoming law, a plaintiff asserting promissory estoppel must demonstrate "(1) a clear and definite agreement; (2) proof that the party urging the doctrine acted to its detriment in reasonable reliance on the agreement; and (3) a finding that the equities support the enforcement of the agreement." *Davis v. Davis*, 855 P.2d 342, 347 (Wyo. 1993). Upon the undisputed facts before us, we conclude no "clear and definite agreement" existed between the parties, plaintiffs' reliance on the illustrations was unreasonable, and the equities do not support enforcement of the alleged agreement. Accordingly, we affirm the district court's summary judgment on the issue of promissory estoppel.[8]

---

[8]Maccabees argues, as a matter of Wyoming law, promissory estoppel cannot be used in claims for expanded coverage under an insurance contract, citing **St. Paul Fire & Marine Ins. Co. v. Albany County Sch. Dist.**, 763 P.2d 1255, 1261 (Wyo. 1988). Although true, this proposition is inapplicable here because we are not concerned with the *scope* of insurance coverage, but the respective contractual liabilities of the parties when the insured elects to reduce his or her coverage, an issue to which Wyoming will apply

(continued...)

Wyoming courts will not find a clear and definite agreement where the language of a purported promise is precatory or a "mere expression of hope" occurring in an "obviously preliminary negotiation context." *See Inter-Mountain Threading, Inc. v. Baker Hughes Tubular Serv., Inc.*, 812 P.2d 555, 559 (Wyo. 1991) . Plaintiffs argue the illustrations cannot be considered precatory or a mere expression of hope because the illustrations are written, not oral, and contain specific and detailed representations regarding the Diplomat's performance. However, as we have stated, the illustrations contain multiple signals indicating they are conditional and inchoate representations. The illustration identifies itself as a mere "proposal," does not speak to most of the contract's most vital provisions, and does not provide any specific guidance regarding the manner in which Surrender Charges, clearly contemplated, are to be imposed. *See Rialto Theatre, Inc. v. Commonwealth Theatres, Inc.*, 714 P.2d 328, 334 (Wyo. 1986) ("By its clear and unambiguous language, this portion of the lease agreement is merely an agreement to agree in the future.... In this case, the parties' agreement provides no guidance as to the terms which are to be enforced. Unless the essential terms of such a future agreement are defined with reasonable certainty, there is no contract for the court to enforce."); *Baker*

---

[8](...continued)
promissory estoppel. *See, e.g.*, *Sowers v. Iowa Home Mut. Cas. Ins. Co.*, 359 P.2d 488, 493 (Wyo. 1961) ("Although the doctrines of waiver and estoppel extend to practically every ground on which an insurer may deny liability .... they are not available as a rule, to bring within the coverage of a policy risks not covered by its terms or risks expressly excluded therefrom." (citing 29A *Am.Jur. Insurance* § 1014 (1960)).

*Hughes*, 812 P.2d at 559 (citing *Rialto Theatre* as relevant precedent on the issue of whether a "clear and definite agreement" exists in the context of promissory estoppel).

Furthermore, there is no "clear" promise in the illustrations to refrain from imposing a pro-rata Surrender Charge upon a planned reduction in coverage. The only explicit reference to a "Surrender Charge" in the illustrations is a statement which reads "Surrender Values are the accumulation values less any surr. charges." Plaintiffs argue we can infer from this statement and the table of values provided in the illustrations that no Surrender Charge would be imposed upon a reduction in coverage. However, this claim is clearly wrong, given plaintiffs profess the ability to calculate the maximum coverage reduction Surrender Charge using the same inferential process. An inferential process which alternately yields a promise to impose no Surrender Charge and a promise to charge a small, specific Surrender Charge cannot be said to have produced a "clear and definite agreement" on the point. Finally, a whole host of terms, conditions, and exclusions covered by the policy itself are not mentioned, referred to, or even outlined in the illustration. Plaintiffs could not have "agreed" to the terms of the illustrations because there are no terms with which to agree, merely a set of numerical projections for two sets of potential events ("Assumed Interest" and "Guaranteed Interest"). Because the illustrations are inherently inchoate, clearly contemplate the imposition of Surrender Charges, and do not present a clear agreement on Maccabees' part to refrain from imposing Surrender Charges, we cannot conclude, even viewing the evidence in the light

most favorable to the plaintiffs, that Maccabees clearly and definitely agreed to refrain from imposing a pro-rata Surrender Charge upon a reduction in coverage.

Turning to the second element of promissory estoppel, we find plaintiffs' reliance on the illustrations unreasonable. Plaintiffs' could not have reasonably believed the illustrations provided adequate information regarding their policies' potential performance. In addition to the numerous indications the illustrations were tentative, many essential terms of the contract — the manner in which the interest rate is to be determined, the monthly cost of a particular coverage level, the fees and charges which might attend changes in coverage — are not mentioned in the illustrations. Plaintiffs knew a comprehensive, written document which would explain these vital terms (their policies) would follow after submission of their applications. Each of the plaintiffs planned to reduce their coverage in the second year and hoped thereby to avoid the need to pay subsequent premiums. Given their plans depended entirely upon receiving no or only a nominal Surrender Charge for such a planned reduction in coverage and given plaintiffs could not have believed the illustrations adequately described the terms of their insurance agreement, we conclude plaintiffs' reliance on the illustrations was unreasonable. *See **Baker Hughes***, 812 P.2d at 560 (concluding reliance was unreasonable and unforeseeable where "[i]t is clear from the evidence that Baker Hughes' business relationships under either form of agreement would not have been simple arrangements free of details. Either contemplated relationship would have bound the

parties for a substantial period of time and would have involved substantial sums of money. Considering what is at stake ..., it is important that the relationship and commitment of the parties, each to the other, be carefully expressed in a formally executed document.").

We also conclude the equities do not support enforcement of the agreement. "The doctrine of promissory estoppel can only be invoked when it is necessary to avoid injustice." *Davis*, 855 P.2d at 349. No injustice currently exists, nor will any be avoided by enforcing the contract according to the plaintiffs' claims. Plaintiffs are suing for specific enforcement of what amounts to a "free" insurance contract. They have already received one year of insurance coverage, at no cost to themselves, and, to date, plaintiffs have lost no money and have assumed no personal obligation as a result of this transaction. In addition, plaintiffs failed to avail themselves of the ten day examination period expressly provided by the policy. Plaintiffs could have quickly determined the policy was unsatisfactory and returned it for a refund simply by reading the policy, as Wyoming law requires them to do; they did not choose to do so. Finally, it is undisputed the miscalculation in the illustrations resulted from an inadvertent programming error in Maccabees' promotional software. Under these circumstances, we cannot conclude the equities would support enforcement of the agreement. Because plaintiffs have not demonstrated any of the required elements of promissory estoppel, their estoppel claims must fail.

The judgment of the district court is **AFFIRMED.**