362 S.E.2d 334

Paul A. ROMANO, as Executor of the Estate of Melvin J. Romano

v.

NEW ENGLAND MUTUAL LIFE INSURANCE CO., a Corporation, and Paul G. Young, Trustee for the Association of Community Retailers, Inc.

No. 17311.

Supreme Court of Appeals of West Virginia.

Oct. 23, 1987.

David Romano and James Riley, Clarksburg, for plaintiff.

James E. McNeer, Catherine D. Munster, J. Michael McDonald, Clarksburg, Paul G. Young, Herbert Underwood, Clarksburg, for New England Mut. Life Ins. Co.

MILLER, Justice:

In this appeal from a summary judgment, we consider whether the trial court erred in holding as a matter of law that a condition contained in the master policy of a group insurance plan was binding upon an insured. The master policy was not made available to the insured prior to his death, and the condition in question was inconsistent with promotional materials prepared by the insurer and relied upon by the insured.

## I.

Creasey Company is a wholesale food distributor in Clarksburg, West Virginia. In 1977, a local insurance agent, Paul G. Young, began arrangements to provide group life insurance for all interested Creasey employees and customers. He spoke initially with representatives of New England Mutual Life Insurance Company, who informed him that a minimum of 100 participants were required to qualify for group insurance. A nonprofit corporation, Association of Community Retailers, Inc., was immediately chartered to serve as the group policyholder. Mr. Young was appointed as one of the directors of the corporation and as the trustee of the insurance plan. Over the next six to seven months, he actively solicited participants for the group.

Melvin J. Romano was for ten years the sole proprietor of Melvin's Key Market, a Clarksburg area grocery store which regularly purchased foods from Creasey. Mr. Romano expressed an interest in joining the group and, on October 23, 1977, signed an enrollment card.[1] The card was retained by Mr. Young and forwarded to

---

1. It appears that the enrollment card, which requested only minimal background information, was completed by Mr. Young and subsequently signed by Mr. Romano. It is not argued that any of the information provided on the card was false or otherwise inaccurate.

New England after the required 100 participants had been obtained. There was no further application requested by New England from Mr. Romano or any of the other participants in the plan. Coverage under the plan was in an amount equal to Mr. Romano's annual earnings, or $25,000.

In late 1977 or early 1978, Mr. Romano apparently ended business operations at Melvin's Key Market. He sold all of the store's inventory of merchandise, but retained several large pieces of refrigeration equipment. After the store was closed, Mr. Romano developed plans to open a custom meat shop in Clarksburg. He also worked directly for Creasey as a sales consultant, though the record does not fully disclose the nature of his employment relationship.

On June 1, 1978, correspondence was sent to Mr. Romano by Mr. Young which reported that the start-up date for the plan was July 1, 1978. It also announced that New England would charge participants in the plan a "quinquennial" premium rate which was higher than the rate previously discussed. A one page summary was enclosed which included the new monthly premium to be charged as well as a list of enrolled employees. Mr. Romano was the only enrolled employee at Melvin's Key Market. A separate page provided the complete rate schedule. Mr. Young's letter directed Mr. Romano to respond promptly if he objected to the revised rate. If a response was not received within a few days, it would be assumed the rate was satisfactory. There is no record of any response by Mr. Romano.

Also included with the letter was another typewritten enclosure prepared by New England which summarized the eligibility requirements and coverages provided under the plan. The enclosure read in part:

"WHO IS ELIGIBLE:

"All employees who work 30 hours or more a week are covered under the program.

"EFFECTIVE DATE:

"The effective date is July 1, 1978.

\*　　\*　　\*　　\*　　\*　　\*

"GUARANTEED ISSUE:

"Under this policy no medical questions of any kind are asked. The policy is guaranteed issue without any medical evidence."

There was no mention of any policy conditions or of additional requirements for eligibility.

On June 26, 1978, Mr. Romano was hospitalized for a myocardial infarction. He died on July 2, 1978, one day after the master policy became effective. He was not provided with a copy of the master policy or a certificate of insurance prior to his death.

Within a week, Mr. Young was orally notified of Mr. Romano's death. On July 7, 1978, Mr. Young spoke by telephone with a New England claims representative to inquire what steps should be taken regarding the July premium statement. According to his deposition, he reported that Mr. Romano had been hospitalized in the latter part of June, 1978, and died on July 2, 1978, without having returned to his employment. He was advised by the representative that coverage was unavailable for Mr. Romano as he was not "actively at work" on July 1, 1978, a condition precedent to coverage under the master policy.[2] As a consequence, Mr. Young was instructed to withhold the statement for Mr. Romano's monthly premium. Later in the day, he

---

**2.** The actively-at-work condition in the master policy reads as follows:

"Each person who is an employee of a [participating employer] on the date of issue of this Policy is eligible to be insured under any part of the employee insurance provided hereunder on the date of issue of this Policy.

\*　　\*　　\*　　\*　　\*　　\*

"The employee insurance on any employee who is not actively at work on the date the insurance would otherwise become effective

or increase, shall become effective or increased automatically on the date of his return to active work.

"For the purpose of the foregoing, an employee who is absent from work shall be considered to be actively at work: (1) [sic] If he is absent from work by reason of vacation and at the time his insurance would otherwise become effective he has not been absent from work for a period of more than two (2) weeks."

conferred with Mr. Romano's son, the plaintiff herein, who had been appointed executor of his father's estate. Mr. Young advised the plaintiff of New England's denial of coverage under the group policy and explained to him the actively-at-work requirement.

The plaintiff, during his deposition, testified that Mr. Young told him simply that the New England policy was not in effect and did not mention the actively-at-work condition. His belief, based upon the conversation, was that the group plan had not yet become operative on the day Mr. Romano died. He therefore did not pursue the matter further.

Late in 1981, the plaintiff discovered among Mr. Romano's papers the June 1, 1978 letter and the materials provided by Mr. Young. A proof of loss was promptly prepared by the plaintiff and provided to New England, and the claim was denied by letter of October 5, 1982. The basis for the denial was a determination by New England that Mr. Romano was not actively at work on July 1, 1978, and was therefore ineligible for policy coverage.

Suit was brought in the Circuit Court of Harrison County in December, 1982, seeking compensatory and punitive damages. The complaint alleged that New England had breached its contract of insurance by refusing to pay the full amount of the policy, and had committed unfair claim settlement practices in violation of W.Va. Code, 33–11–4(9).[3] It was further alleged that both New England and Mr. Young had

"intentionally and wilfully conceal[ed]" information that the policy had become effective on July 1, 1978, and that benefits were payable thereunder. The defendants asserted various defenses arising under the policy, including: (1) that Mr. Romano was not actively at work on July 1, 1978, a condition precedent to coverage; (2) that proof of loss · was not provided to New England within 90 days of the loss;[4] and, (3) that suit was not brought within 39 months of the loss.[5]

After limited discovery, both defendants moved for summary ·judgment. By order of November 17, 1983, the circuit court granted the motion on behalf of Mr. Young and held that he "breached no alleged duty to the plaintiff or plaintiff's decedent, ... with reference to the group life insurance policy in question." An order granting New England's motion was entered on December 3, 1985, but the grounds upon which the court relied were not stated. This appeal followed.

## II.

### A.

Our principal inquiry in this case is whether Mr. Romano was covered as an insured under New England's group plan. We observe at the outset that two key issues appear to be undisputed: (1) that there was a valid contract of insurance between New England, as insurer, and Association of Community Retailers, Inc., as policyholder; and (2) that Mr. Romano had

---

3. W.Va.Code, 33–11–4(9), provides, in relevant part:

 *"Unfair claim settlement practices.*—No person shall commit or perform with such frequency as to indicate a general business practice any of the following:

 \* \* \* \* \* \*

 "(d) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

 \* \* \* \* \* \*

 "(f) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear[.]"

 We recognized in *Jenkins v. J.C. Penney Cas. Ins. Co.,* 167 W.Va. 597, 280 S.E.2d 252 (1981), that a violation of the above provisions by an

insurer gives rise to a private right of action in favor of an aggrieved insured or beneficiary.

4. The policy provides: "Affirmative proof of loss on which .claim may be based must be furnished to the Insurance Company not later than ninety (90) days after the date of such loss."

5. The policy provides:

 "No action at law or in equity shall be brought to recover on this Policy prior to the expiration of sixty (60) days after proof of loss has been filed in accordance with the requirements of this Policy, nor shall such action be brought at all unless brought within three (3) years from the expiration of the time within which proof of loss is required by this Policy."

performed all acts necessary to be enrolled as an insured under the policy. New England contends, however, that Mr. Romano failed to satisfy a condition for coverage under the master policy—he was not actively at work on the effective date of the policy and did not return to active work prior to his death. It, therefore, urges us to conclude that while Mr. Romano was properly enrolled in the plan, he was rendered ineligible for coverage and benefits are not payable.

The plaintiff, in response, does not directly attack the master policy's requirement that an insured must be actively at work to qualify for coverage.[6] Rather, he contends that the actively-at-work condition is inapplicable, or more properly that the insurer is estopped to invoke it, as it was not included in the materials accompanying Mr. Young's letter of June 1, 1978. The narrow question we address is whether the distribution of promotional materials by New England to Mr. Romano, upon which he relied in obtaining the insurance, will bar New England from asserting contrary provisions in the master policy.

### B.

 It is useful to begin our analysis with a review of the relevant principles of insurance law. Group insurance has been defined as the coverage of several individual persons under one comprehensive insurance policy. *Adkins v. Aetna Life Ins. Co.*, 130 W.Va. 362, 43 S.E.2d 372 (1947); 1 J. Appleman, *Insurance Law & Practice* § 41 (1981). Though typically group insurance involves the employees of a single employer, it has been increasingly utilized among persons with other types of shared interests.[7] While group insureds are not policyholders and usually do not enjoy privity of contract with the insurer, it is recog-

nized that they are beneficiaries of the insurance contract and may sue directly to enforce its provisions. Thus, ordinarily, the general rules which govern all contracts of insurance are held to apply as well to group contracts. 1 J. Appleman, *Insurance Law & ⁹ Practice* §§ 44–46 (1981).

### C.

 A number of courts have applied the doctrines of estoppel and waiver to prevent an insurer from invoking conditions or exclusions in a master policy where contrary information has been provided to and relied upon by the insured. For example, most states require a group insurer to provide to insureds a certificate which explains summarily the coverages provided under the master policy, including any noteworthy conditions, exclusions, or exceptions. W. Meyer, *Life and Health Insurance Law* § 19:14 (1972). Where an insurer does not timely issue a certificate as required, it may be estopped to deny coverage based upon any such policy provisions. *E.g., Breeding v. Massachusetts Indemnity & Life Ins. Co.*, 633 S.W.2d 717 (Ky.1982); *Gende v. Guarantee Trust Life Ins. Co.*, 83 Ill.App.3d 962, 39 Ill.Dec. 388, 404 N.E.2d 979 (1980).

Similarly, where a certificate is provided to an insured which is at variance with the master policy, an insurer will be bound by more permissive provisions outlined in the certificate. *E.g., Lecker v. General American Life Ins. Co.*, 55 Haw. 624, 525 P.2d 1114 (1974); *Bellamy v. Pacific Mut. Life Ins. Co.*, 651 S.W.2d 490 (Mo.1983); *Evans v. Lincoln Income Life Ins. Co.*, 585 P.2d 407 (Okla.1978); *Hayes Truck Lines, Inc. v. Investors Ins. Corp.*, 269 Or. 565, 525

---

**6.** Conditions which limit group coverage to insureds who are actively at work when the policy becomes operative have been rather uniformly upheld. *See generally,* Annot., 58 A.L.R.3d 993 (1974). Such a requirement has traditionally been viewed as a substitute for medical examinations of individual insureds, and thus serves to assure an "average" group from an actuarial standpoint. W. Meyer, *Life and Health Insurance Law* § 21:2 (1972).

**7.** W.Va.Code, 33–14–1, *et seq.,* which regulates group life insurance, recognizes employees, debtors, and the members of labor unions and credit unions as insurable groups. The policy at issue here is a "trustee" group policy. W.Va. Code, 33–14–5, authorizes two or more employers or labor groups to jointly establish a fund for the purchase and maintenance of group insurance, and to appoint a trustee to administer the fund and insurance plan.

P.2d 1289 (1974).[8] This rule is bottomed on the recognition that insureds will ordinarily be privy to and rely upon the certificate rather than the master policy.

The situation involved here is closely analogous. New England prepared and distributed to prospective insureds materials which explained the basic insurance coverage available under its group life plan. Obviously, the very purpose of the materials was to induce Creasey customers to participate in the plan and their employees to enroll as insureds. Where advertisements, sales brochures, or similar materials are provided as an inducement to insureds, cases uniformly hold that insurers are bound by the provisions contained therein.

In *Lewis v. Continental Life & Accident Co.*, 93 Idaho 348, 461 P.2d 243 (1969), an insurer under a group life policy provided to prospective insureds an "easy read" promotional handbook. The handbook stated that if the insured became totally disabled prior to age sixty, his insurance under the plan would continue without the payment of premiums. It also said that proof of disability would be required from the insured "from time to time." Upon the death of the insured, the insurer denied coverage based upon a more restrictive proof requirement contained in the master policy. The Idaho Supreme Court held, based upon the "composition and distribution" of the handbook, that the insurer was estopped to invoke the contrary master policy provisions. The court commented:

> "[The] handbook explained coverage under the program in clear, informal and easily read English. It was expected that employees would read and rely upon this booklet. And the company did or at least should have known that if an employee wished to determine what his coverage was he would turn to this pamphlet before the hard to decipher certificate of insurance or the master policy.

The requirement for premium-free death benefit extension, as stated in the handbook, is simply a readiness to supply [the insurer] with evidence of disability 'from time to time.' Under these conditions it would be inequitable for the [insurer] to have sold insurance based on a statement of this simple, less onerous duty and then to enforce a stricter provision later on." 93 Idaho at 354, 461 P.2d at 249. *See also Linn v. North Idaho Dist. Medical Serv. Bureau, Inc.*, 102 Idaho 679, 638 P.2d 876 (1981).

Other courts, applying a variant analysis, have held that representations contained in promotional materials must be looked to so as to construe the policy in accordance with the insured's reasonable expectations. *E.g., Sparks v. Republic National Life Ins. Co.*, 132 Ariz. 529, 647 P.2d 1127, *cert. denied*, 459 U.S. 1070, 74 L.Ed.2d 632, 103 S.Ct. 490 (1982). In *Sparks*, an insured under a group health insurance plan was provided with a sales brochure outlining the plan's coverage. He was provided with no additional information about the plan. Within one month after purchasing the insurance, the insured and his children were seriously injured in a plane crash. When the insured's employer ceased to pay premiums, the insurer refused to pay further medical benefits upon the ground that under its policy benefits ended when coverage was terminated. The sales brochure did not so provide. The Arizona Supreme Court concluded that, when read in light of the brochure, the policy would be deemed to provide benefits beyond the termination of insurance coverage. *See also Crawford v. Mid–American Ins. Co.*, 488 S.W.2d 255 (Mo.1972); 13A J. Appleman, *Insurance Law & Practice* § 7534 (1976) (citing cases).

We approve of both the *Lewis* and *Sparks* decisions. They represent a grow-

---

8. In *Warden v. Bank of Mingo*, 176 W.Va. 60, 341 S.E.2d 679 (1985), we dealt with a related problem. There the bank issued a certificate of insurance under its group creditor policy with Appalachian Life Insurance Company to one of its borrowers. The certificate contained a disability payment provision that exceeded the amount authorized in the master insurance con-

tract. The bank and Appalachian issued a new certificate of insurance for a reduced amount of benefits. Shortly thereafter, the debtor became totally disabled and sued both parties under his original certificate. We held the original certificate constituted the contract and could not be unilaterally changed to conform to the master policy which the borrower had never seen.

ing trend in the law to give binding effect to sales and promotional materials provided to insureds by the insurer. We recognize, as have other jurisdictions, that lay insureds rely upon such materials as an authoritative summary of the requirements for eligibility and the coverages provided under the insurance plan. Where a conflict exists between a master policy and other informational resources prepared and distributed at the insurer's behest, courts have not hesitated to hold that insureds are not bound by more restrictive provisions in the policy. Annot., 6 A.L.R.4th 835 (1981) (effect of policy limitations or exclusions not in materials provided to insureds); Annot., 36 A.L.R.3d 541 (1971) (estoppel based upon promotional or explanatory materials provided to insureds). We, therefore, conclude that where an insurer provides sales or promotional materials to an insured under a group insurance policy, which the insurer knows or should know will be relied upon by the insured, any conflict between such materials and the master policy will be resolved in favor of the insured.

■ Applying our rule to the case at hand, we are of the opinion that New England cannot assert the actively-at-work condition to avoid liability under the policy. The plain import of the materials provided to Mr. Romano on June 1, 1978, was that he had complied with all conditions required for coverage. The only eligibility requirement to which Mr. Romano was specifically alerted by the materials was full-time employment status.[9] We believe the materials issued by New England were such as to lead Mr. Romano to a reasonable and honest belief that he was covered under the policy. It would, we believe, be inequitable to permit New England to enforce the more onerous policy condition where previous communications with the insured suggested its nonexistence. We accordingly hold that New England's motion for summary judgment was improperly granted.

### III.

Having determined that New England cannot invoke its actively-at-work condition against the plaintiff, we next inquire whether the record supports summary judgment on behalf of Mr. Young. The gravamen of the plaintiff's claim against Mr. Young is that he, alone or in combination with New England, concealed the fact that the group policy had become effective on July 1, 1978. The circuit court was of the opinion that Mr. Young breached no duty to Mr. Romano or to the plaintiff, and was entitled to judgment as a matter of law. This was an incorrect conclusion of law, and we reverse the judgment of the circuit court.

Mr. Young attempts to characterize his alleged wrongful conduct as nonfeasance which, it is argued, will not support a tort claim. His argument is straightforward. New England's refusal to pay policy benefits to the plaintiff might have constituted a breach of contract, but was not tortious. Consequently, his conduct in simply apprising the plaintiff of New England's decision was not tortious.

■ Unfortunately, Mr. Young misperceives the thrust of the plaintiff's theory of liability. It is not Mr. Young's communication of the decision by New England which provides the basis of the claim. The heart of the plaintiff's claim is that Mr. Young affirmatively and unqualifiedly represented that the group policy was not in effect, and that his representation was untrue. This is, we believe, an allegation of common law fraud. We held in Syllabus Point 1 of *Lengyel v. Lint,* 167 W.Va. 272, 280 S.E.2d 66 (1981):

> "The essential elements in an action for fraud are: '(1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied

---

**9.** Another argument pressed by the defendants on appeal is that Mr. Romano was ineligible for coverage since his business had ended its opera- tions prior to July 1, 1978. This point was not argued below and we, therefore, decline to address it.

upon it.' *Horton v. Tyree,* 104 W.Va. 238, 242, 139 S.E. 737 (1927)."

There is sharp disagreement between the parties regarding the substance and truthfulness of the information relayed to Mr. Romano during the conversation of July 7, 1978. Mr. Young says that he apprised the plaintiff of the insurer's denial of coverage and detailed the reasons for the denial. The plaintiff, on the other hand, contends that he was advised that the policy was not even in effect on the day of Mr. Romano's death. Such a conflict in testimony is not susceptible of summary judgment.

Our cases have repeatedly held that a motion for summary judgment may not be granted where there is a genuine issue as to any material fact. As we said in Syllabus Point 3 of *Aetna Cas. & Surety Co. v. Federal Ins. Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963):

"A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law."

See also, *Southern Elec. Supply Co. v. Raleigh County Nat'l Bank,* 173 W.Va. 780, 320 S.E.2d 515 (1984); *Clendenin Lumber & Supply Co. v. Carpenter,* 172 W.Va. 375, 305 S.E.2d 332 (1983). We have also observed that a judge should utilize the summary judgment device cautiously, even where he would be inclined to direct a verdict, as indicated by Syllabus Point 2 of *Lengyel:*

" 'Even if the trial judge is of the opinion to direct a verdict, he should nevertheless ordinarily hear evidence and, upon a trial, direct a verdict rather than try the case in advance on a motion for summary judgment.' Syl. pt. 1, *Masinter v. Webco Co.* [164 W.Va. 241], 262 S.E.2d 433 (1980)."

We believe genuine issues of fact are presented in the fraud claim against Mr. Young, and that summary judgment was improper.[10]

## IV.

For the reasons discussed above, we reverse the judgment of the Circuit Court of Harrison County and remand the case for further proceedings not inconsistent with this opinion.

Reversed and Remanded.

10. As mentioned previously, New England and Mr. Young also contend on appeal that the plaintiff's suit is untimely. It is, of course, well settled that the appropriate statute of limitations will be tolled where the defendant "by any ... indirect ways or means, obstruct[s] the prosecution of [the] right [of action]." W.Va.Code, 55–2–17. This broad tolling provision has been held to include a defendant's fraudulent concealment of his wrongful acts. *See, e.g., Hundley v. Martinez,* 151 W.Va. 977, 158 S.E.2d 159 (1967); *Gray v. Wright,* 142 W.Va. 490, 96 S.E.2d 671 (1957); *Boyd v. Beebe,* 64 W.Va. 216, 61 S.E. 304 (1908). We believe the questions of whether the defendants actively concealed the status of the group policy, and when the true status should have been discovered, lie within the province of the jury.