**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1451**

ROBIN L. HINKLE, individually and on behalf of those similarly situated,

Plaintiff − Appellant,

v.

SAFE-GUARD PRODUCTS INTERNATIONAL, LLC, a Georgia limited liability company,

Defendant – Appellee,

and

JOHNNY HINKLE; CASEY JOE MATTHEWS; TIMOTHY MAY and CONNIE MAY, husband and wife; SANTANDER CONSUMER USA, INC., an Illinois corporation,

Defendants.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. John T. Copenhaver, Jr., Senior District Judge. (2:15-cv-13856)

Argued: September 11, 2020                    Decided: December 15, 2020

Before KING, WYNN, and DIAZ, Circuit Judges.

Affirmed by unpublished opinion. Judge Diaz wrote the opinion, in which Judge King and Judge Wynn joined.

**ARGUED:**  Jonathan R. Marshall, BAILEY & GLASSER LLP, Charleston, West Virginia, for Appellant. Jeffrey D. Van Volkenburg, VARNER & VAN VOLKENBURG PLLC, Clarksburg, West Virginia, for Appellee.  **ON BRIEF:**  Raymond S. Franks II, BAILEY & GLASSER LLP, Charleston, West Virginia, for Appellant.  Debra Tedeschi Varner, James A. Varner, Sr., VARNER & VAN VOLKENBURG PLLC, Clarksburg, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Robin Hinkle appeals the district court's dismissal of her claims against Safe-Guard Products International, LLC under Articles 2 and 6 of West Virginia's Consumer Credit and Protection Act ("CCPA"), W. Va. Code § 46A-1-101 *et seq.* Hinkle also appeals the district court's grant of summary judgment to Safe-Guard on her claims under West Virginia's Unfair Trade Practices Act ("UTPA"), W. Va. Code § 33-11-1 *et seq.*, and for common law bad faith and breach of contract.

For the reasons that follow, we affirm.

I.

A.

In July 2006, Robin Hinkle and her then-husband Johnny Hinkle purchased a new car at C&O Motors in West Virginia. C&O salesman Paul Waugh asked the Hinkles if they also wanted to purchase Guaranteed Asset Protection ("GAP") insurance provided by Safe-Guard. Subject to certain terms and conditions, GAP insurance would relieve the Hinkles of payments owed on the car if it were declared a total loss because of an accident and the Hinkles owed more than the car's value at the time of the accident.

Before purchasing the insurance, Robin Hinkle asked Waugh to confirm that "if there was an accident . . . whatever the insurance didn't pay, [the Hinkles] wouldn't owe any more money on the loan." J.A. 379. Waugh responded, "[Y]es, that is what it does." *Id.* Based on this exchange, the Hinkles "were led to believe" that GAP insurance "would

3

protect [them] from continuing to owe any outstanding balance still owed on the loan after a total loss, whatever the circumstances." J.A. 309.

Before the Hinkles agreed to purchase the insurance, Robin briefly reviewed the two-page GAP Addendum, including the terms and conditions on the second page. J.A. 301–02. This second page included, *inter alia*, a definition of "Unpaid Debt Balance" as "the amount owed by the Customer to clear the outstanding Installment Sales Contract" and stated that "[t]his amount shall not include any and all unearned and/or future interest or rental charges, finance or lease charges, late charges, delinquent payments, deferred payments, [or] uncollected service charges, . . ." J.A. 119. The parties agree that this definition of "Unpaid Net Balance" excludes from coverage all late payments and penalties arising therefrom and only covers the outstanding loan balance, assuming timely payment.

The GAP insurance policy cost $495, which C&O paid to Safe-Guard on the Hinkles' behalf in a lump sum payment. C&O then included the $495 in the amount financed for the car. During the loan's term, the Hinkles missed payments, made partial payments, had some payments deferred, and incurred late fees.

In June 2011, Robin Hinkle was involved in a car accident. Her insurance carrier, State Farm Insurance, determined that the car was a total loss and that its cash value was $7,285. State Farm paid that amount to Santander Consumer USA, Inc., which had acquired the loan from C&O. Including the late fees and delinquent and deferred payments, Robin Hinkle then owed $11,983.81 on the loan. Had Hinkle made timely payments, she would have owed only $5,283.68.

4

Robin Hinkle filed a claim with Safe-Guard under the GAP insurance policy for the amount owed on the loan above the amount that State Farm paid.  Safe-Guard denied the claim, citing the GAP Addendum's definition of "Unpaid Net Balance," which excludes "late charges, delinquent payments, [and] deferred payments."  J.A. 141.  Safe-Guard explained that "[d]ue to inconsistencies in [the Hinkles'] payment history, such as late payments, the loan was re-amortized," and only $5,283.68 was subject to cancellation.  *Id.* And because State Farm had paid more than that amount, Safe-Guard stated that "there [was] no coverage available."  *Id.*

B.

Robin Hinkle filed suit in state court alleging violations of the UTPA (which governs the trade practices of insurers), common law bad faith, and common law breach of contract against Safe-Guard and Santander.  Specifically, Hinkle alleged that Safe-Guard and Santander violated the UTPA by (1) misrepresenting pertinent facts or insurance policy provisions, (2) failing to acknowledge and act reasonably promptly upon her claim, (3) failing to adopt and implement reasonable standards for prompt investigation of claims, and (4) refusing to pay claims without conducting a reasonable investigation.  *See* W. Va. Code § 33-11-4.  Hinkle also alleged that Safe-Guard and Santander breached the terms of the Gap Addendum and acted in bad faith by refusing to cover the total amount she owed on the car loan.

Hinkle later moved to amend her complaint to add class action claims on behalf of all West Virginia residents who purchased Safe-Guard's GAP insurance, and the court granted the motion.  Safe-Guard then removed the case to the United States District Court

5

for the Southern District of West Virginia pursuant to the Class Action Fairness Act, which extends federal diversity jurisdiction to certain class action suits and allows for removal of those suits to federal court. *See Dominion Energy, Inc. v. City of Warren Police & Fire Ret. Sys.*, 928 F.3d 325, 329–30 (4th Cir. 2019) (citing 28 U.S.C. §§ 1332(d)(2), (5)(B); *id.* § 1453(b)). Hinkle also settled all claims against Santander, leaving Safe-Guard as the sole remaining defendant.

In her Amended Class Action Complaint, Hinkle realleges the claims in her original complaint and also alleges violations of the CCPA. With respect to the CCPA claims, she alleges that Safe-Guard sold insurance and collected insurance premiums without a license to do so,[1] thereby violating Article 2 of the CCPA, which governs debt collection, *see* W. Va. Code § 46A-2-101 *et seq.*, and Article 6, which governs unfair or deceptive acts, *see id.* § 46A-6-101 *et seq.*

Safe-Guard moved to dismiss the CCPA claims, arguing that it wasn't a debt collector under the Act and that the provision on unfair or deceptive acts doesn't apply to the sale of insurance. The district court granted the motion, holding that Safe-Guard wasn't a debt collector. The court also held that the Act's unfair or deceptive acts provision doesn't apply to the sale of insurance.

Safe-Guard then moved for summary judgment on the remaining UTPA, bad-faith, and breach of contract claims. The district court granted the motion. The court concluded

---

[1] West Virginia law provides that "[n]o person may act as an insurer and no insurer may transact insurance in West Virginia except as authorized by a valid license issued by the commissioner[.]" W. Va. Code § 33-3-1(a).

that there was no breach of contract because the GAP Addendum's definition of "Unpaid Net Balance" unambiguously excluded late charges and delinquent and deferred payments. Thus, Safe-Guard properly determined that only $5,283.68 of the outstanding loan amount was subject to cancellation. The court also held that Waugh's alleged statement that the GAP insurance policy applied "whatever the circumstances," J.A. 439, couldn't "overcome the express written terms of [the] policy," J.A. 440, and thus had not created any ambiguity. And because the bad-faith claim relied on the contract claim, the court dismissed it as well.

As to the UTPA claims, the district court concluded that Hinkle failed to show that "the insurance company had a 'general business practice' of committing unfair claim settlement practices and that the breach of the law was not an isolated event." J.A. 442 (quoting *Barefield v. DPIC Companies, Inc.*, 600 S.E.2d 256, 264 (W. Va. 2004)). The court also reiterated that Waugh's alleged statement didn't negate the GAP Addendum's unambiguous terms and, even if it did, Waugh's alleged misrepresentation was an isolated event. Lastly, the court held that Safe-Guard conducted a reasonable investigation of, and acted reasonably promptly on, Hinkle's claim.

This appeal followed.

## II.

We review a district court's dismissal under Federal Rule of Civil Procedure 12(b)(6) de novo, "assuming as true the complaint's factual allegations and construing all reasonable inferences in favor of the plaintiff." *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017) (cleaned up). We also review de novo the district court's

7

disposition of a motion for summary judgment, *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 312 (4th Cir. 2013), and any issue of contract interpretation underlying that disposition. *FindWhere Holdings, Inc. v. Sys. Env't Optimization, LLC*, 626 F.3d 752, 755 (4th Cir. 2010).

Because this case arises under our diversity jurisdiction, we apply controlling West Virginia law on settled issues and predict how the state's highest court would rule on unsettled issues. *See McFarland v. Wells Fargo Bank, N.A.*, 810 F.3d 273, 279 (4th Cir. 2016).

A.

We first address the district court's dismissal of Hinkle's CCPA claims. Article 2 of the CCPA provides that "[n]o debt collector shall use any fraudulent, deceptive or misleading representation or means to collect or attempt to collect claims or to obtain information concerning consumers." W. Va. Code § 46A-2-127. A "debt collector" is "any person or organization engaging directly or indirectly in debt collection." *Id.* § 46A-2-122(d). "Debt collection," in turn, is "any action, conduct or practice of soliciting claims for collection or in the collection of claims owed or due or alleged to be owed or due by a consumer." *Id.* § 46A-2-122(c). And a "claim" is "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance or service which is the subject of the transaction is primarily for personal, family or household purposes." *Id.* § 46A-2-122(b).

Hinkle argues that Article 2 may "be enforced with no deferral of payment," and thus it applies to obligations "paid for at the point of sale." Appellant's Br. at 20. Because

8

no West Virginia state court has determined whether Article 2 applies to obligations paid for at the point of sale, we must anticipate how the Supreme Court of Appeals of West Virginia would rule. "In determining how a specific statute should be applied, [West Virginia courts] look first to the statute's language." *Ancient Energy, Ltd. v. Ferguson*, 806 S.E.2d 154, 157 (W. Va. 2017) (cleaned up). "If the text, given its plain meaning, answers the interpretive question, the language must prevail and further inquiry is foreclosed." *Id.* (cleaned up).

We therefore turn first to the statute's text. As explained above, a "claim" is an obligation to pay money "arising out of a transaction." Giving the word "arise" its plain meaning suggests that the duty to pay money must stem from or result from the transaction. Thus, for there to be a claim, some duty to pay money must extend beyond the transaction. Whether this is the case depends on the nature and scope of the transaction at issue.

Here, Hinkle contends that she "was obliged to pay money as the result of her decision to purchase the GAP insurance." Appellant's Br. at 8. Thus, she characterizes the transaction as her decision or agreement to purchase GAP insurance, out of which the duty to pay allegedly stemmed.

Safe-Guard, on the other hand, asserts that it "received a one-time, up-front payment in exchange for the policy" and that the Hinkles "had no ongoing duty to pay Safe-Guard anything else arising from that transaction." Appellee's Br. at 1–2. Thus, Safe-Guard characterizes the transaction as encompassing the Hinkles' agreement to purchase the insurance and their payment (via C&O) for it. And because no duty to pay extends beyond the transaction, there is no claim.

9

We agree with Safe-Guard. The plain meaning of "transaction"— an exchange or transfer of goods, services, or funds—reveals the error in Hinkle's characterization. There was no exchange or transfer when the Hinkles agreed to purchase GAP insurance. Instead, the exchange occurred when they paid the $495 fee. Thus, the transaction at issue here encompasses Safe-Guard's offer of GAP insurance and the Hinkles' payment in exchange. And because the exchange included the Hinkles' payment in full, no duty to pay money resulted from the transaction. Therefore, there was no claim under Article 2 of the Act, and Safe-Guard was not soliciting or collecting a claim when it sold GAP insurance.

Hinkle's other arguments lack merit. Hinkle cites *Dunlap v. Friedman's, Inc.*, 582 S.E.2d 841 (W. Va. 2003) and *Dan's Carworld, LLC v. Serian*, 677 S.E.2d 914 (W. Va. 2009) for the proposition that a claim arises where there is payment in full at the point of sale. However, both cases concern transactions (a sales installment contract in *Dunlap* and a car loan in *Dan's Carworld*) where (unlike here) there was no payment in full at the point of sale.

Hinkle also urges us to look to the debt collection provisions of the Fair Debt Collection Practices Act ("FDCPA"), which she contends apply when there is payment in full at the point of sale. Hinkle points to *Bass v. Stolper, Koritzinsky, Brewster & Neider, S.C.*, 111 F.3d 1322 (7th Cir. 1997), as support for her position. But even if the FDCPA applied here (and it does not), *Bass* would be inapposite, as it concerned "whether the payment obligation that arises from a *dishonored* check constitutes a 'debt' as defined in the FDCPA." *Id.* at 1324 (emphasis added). Certainly, an obligation to pay money arises out of an exchange of a dishonored check for goods or services, since there's been no

10

payment in full. Here, by contrast, the Hinkles paid for the GAP insurance policy in full when they purchased the car. We thus agree with the district court that Hinkle failed to state a claim under Article 2 of the CCPA.

B.

We turn next to the district court's dismissal of Hinkle's claim under Article 6 of the CCPA and again review the district court's holding de novo. Article 6 prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." W. Va. Code § 46A-6-104. Such practices include the use "of any deception, fraud, false pretense, false promise or misrepresentation . . . of any material fact . . . in connection with the sale or advertisement of any goods or services." *Id.* § 46A-6-102(7)(M).

Article 6 provides a cause of action for "any person who purchases or leases goods or services and thereby suffers an ascertainable loss of money or property . . . as a result of" a prohibited act or practice. *Id.* § 46A-6-106(a). Article 1 of the CCPA, which sets out its general provisions, defines "[s]ervices" to include insurance. *Id.* § 46A-1-102(47). But Article 1 also states that the CCPA doesn't apply to "[t]he sale of insurance by an insurer, except as otherwise provided in this chapter." *Id.* § 46A-1-105(a)(2).

The district court determined that this latter provision exempts sales of insurance from coverage under Article 6. Said the district court, "[g]iven the broad use of the word 'services' throughout the statute, adopting Hinkle's reading would render the explicit exclusion of insurance sales from the statute meaningless." J.A. 226–27.

11

We agree, albeit for slightly different reasons.[2] For starters, Article 6 of the CCPA doesn't expressly mention insurance, even as other provisions of the statute do. *See* W. Va. Code § 46A-1-102(48) (defining "[s]upervised financial organization" as "any organization, . . . other than an insurance company or other organization primarily engaged in an insurance business, which is required under state law to register or obtain a license from the Commissioner of Banking before conducting business in this state"); § 46A-2-106 (regulating a consumer's cure of default on a loan "other than with respect to a covenant to provide insurance for . . . a security interest"); § 46A-2-111(5) (requiring a consumer lease to contain a "[b]rief description of insurance to be provided or paid for by the lessor, including the types and amounts of the coverages"); § 46A-3-109(a)(2) (permitting a creditor to contract for "[c]harges for insurance . . . Provided, That nothing contained in this section with respect to insurance in any way limits the power and jurisdiction of the Insurance Commissioner"); § 46A-3-109(c) (giving exclusive authority to the Insurance Commissioner "to implement the provisions of this article relating to insurance"); § 46A-3-109a (defining and regulating "[c]ollateral protection insurance"); § 46A-3-115(1) (requiring a creditor to provide a consumer with "a brief description of the insurance paid for by the creditor" if the creditor advances the cost of insurance as part of a consumer loan); § 46A-4-110(1) (prohibiting businesses that are not financial institutions from loaning money but exempting, *inter alia*, "the sale or provision of insurance" under

---

[2] *See United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005) ("We are not limited to evaluation of the grounds offered by the district court to support its decision, but may affirm on any grounds apparent from the record.").

§ 46A-3-109).  The omission of any mention of insurance in Article 6 (while at the same time regulating insurance in other contexts) suggests that the West Virginia legislature didn't intend for it to apply to the sale of insurance.  *See, e.g.*, *Navy Fed. Credit Union v. LTD Fin. Servs., LP*, 972 F.3d 344, 360–61 (4th Cir. 2020) ("Negative implication, also called the *expressio unius* canon, instructs that the expression of one item of an associated group or series excludes another left unmentioned.") (cleaned up).

Second, although the West Virginia Supreme Court of Appeals has not specifically addressed the precise issue before us, it has considered the CCPA's provisions in the context of a claim that a finance company assessed unreasonable and excess credit insurance charges in violation of § 46A-3-109.  *State ex rel. CitiFinancial, Inc. v. Madden*, 672 S.E.2d 365 (W. Va. 2008).  In *CitiFinancial*, the finance company argued that the trial court erred in refusing to grant it summary judgment on the claim because the rates it charged for credit insurance didn't exceed those approved by the West Virginia Insurance Commissioner and that only the Commissioner had jurisdiction over whether those rates were otherwise unreasonable or excessive.  *Id.* at 369–70.

The West Virginia Supreme Court of Appeals agreed with the finance company, noting that "the [CCPA] is replete with language indicating that the Commissioner's jurisdiction over insurance-related matters was not intended to be altered by the provisions of the CCPA."  *Id.* at 374.  The Court further held that private plaintiffs have no right of action to directly challenge insurance rates in court but must first exhaust administrative remedies by seeking a hearing before the Commissioner.  *Id.* at 374–75.  And though monetary damages are not available to parties seeking a hearing before the Commissioner

13

to challenge insurance rates, "the absence of monetary damages does not suggest that an aggrieved party . . . who seeks to challenge insurance rates can bypass the administrative procedures expressly set in place for the purpose of questioning approved insurance rates." *Id.*

*CitiFinancial* informs our analysis here. Hinkle alleges that Safe-Guard violated Article 6 by selling GAP insurance without a license. Assuming the truth of this allegation, as we must at the motion-to-dismiss stage, Safe-Guard violated West Virginia Code § 33-3-1, which prohibits the sale of insurance without a license. West Virginia Code § 33-3-1(e), in turn, subjects those who sell insurance without a license to the provisions of Article 44 of Chapter 33, which regulates insurance.

Under Article 44, the West Virginia Insurance Commissioner may seek injunctive relief to prevent the sale of insurance without a license. W. Va. Code § 33-44-6(a). An insured may also enforce contracts with an unlicensed insurer as though they were lawfully procured. W. Va. Code § 33-44-8(a). But no provision of Chapter 33 provides for a private right of action or defines the sale of insurance without a license as a violation of Article 6 of the CCPA.

In sum, Article 6 doesn't refer to insurance, the CCPA excludes sales of insurance from coverage unless expressly provided otherwise, and the provisions of Articles 1–4 expressly refer to and regulate insurance in unrelated contexts. Accordingly—and contrary to Hinkle's contention—we discern no ambiguity in the CCPA that requires us to interpret

14

it in her favor. The district court thus correctly held that Article 6 doesn't apply to the sale of insurance.[3]

## C.

Finally, we turn to the district court's grant of summary judgment to Safe-Guard on Hinkle's UTPA, bad-faith, and breach of contract claims. Hinkle argues that, pursuant to West Virginia's doctrine of reasonable expectations, the district court erred by not considering Waugh's alleged statement that the GAP insurance policy applied "whatever the circumstances." "[T]he doctrine of reasonable expectations is that the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." *State ex rel. Universal Underwriters Ins. Co. v. Wilson*, 825 S.E.2d 95, 100 (W. Va. 2019) (cleaned up).

The *Universal Underwriters* court held that "as a general rule, in order for the doctrine of reasonable expectations to be applicable to an insurance contract, there must be

---

[3] Hinkle's Amended Complaint also doesn't assert that Safe-Guard's alleged failure to procure a license to sell insurance was the proximate cause of her injury. But under West Virginia law, proximate cause is an essential element of the claim. *See* W. Va. Code § 46A-6-106(b) (providing that damages may not be awarded pursuant to the CCPA for an alleged concealment or omission unless the plaintiff proves that her loss was proximately caused by the concealment or omission). Indeed, the West Virginia Supreme Court of Appeals has held that to plead a violation of Article 6 of the CCPA, the plaintiff "must allege: (1) unlawful conduct by a seller; (2) an ascertainable loss on the part of the consumer; and (3) proof of a *causal connection* between the alleged unlawful conduct and the consumer's ascertainable loss." *White v. Wyeth*, 705 S.E.2d 828, 837 (W. Va. 2010) (emphasis added). Accordingly, this defect in Hinkle's pleading provides a separate ground for dismissing her Article 6 claim.

an ambiguity regarding the terms of that contract." *Id.* at 102. But a "narrow exception" to this general rule exists "when reliable and relevant evidence, extrinsic to the insurance contract, casts a *reasonable doubt* as to whether coverage was provided by an otherwise unambiguous policy." *Id.* (emphasis added).

The district court held, and Hinkle doesn't dispute, that there were no patent ambiguities in the GAP Addendum. As to Waugh's alleged statement that the GAP insurance policy applied "whatever the circumstances," the court explained that "[r]eliance on a salesperson's representations does not overcome the express written terms of a policy." J.A. 440. Thus, the court concluded that "Waugh's alleged portrayal of the GAP policy, even if he did claim that coverage would be available 'whatever the circumstances,' does not render the unambiguous contract terms ambiguous." *Id.* The district court, however, failed to consider whether the "narrow exception" in *Universal Underwriters* for circumstances in which "reliable and relevant evidence, extrinsic to the insurance contract" cast a "reasonable doubt" concerning the policy's coverage, applied to Waugh's alleged assertions concerning the GAP addendum.

Nonetheless, the district court's error is of no moment. Because Hinkle's expectations concerning the GAP policy's coverage were unreasonable as a matter of law, they fall outside the *Universal Underwriters* exception, regardless of Waugh's assertions. Indeed, the cases in which the West Virginia Supreme Court of Appeals has applied the exception illustrate the unreasonableness of Hinkle's expectation of coverage for her delinquent payments and associated fees. *See N.H. Ins. Co. v. RRK, Inc.*, 736 S.E.2d 52, 58–59 (W. Va. 2012) (holding that there was a jury question as to whether insured

16

reasonably relied solely on a 17–page fax as containing all of the terms of its insurance contract and in failing to review the actual policy mailed to it on two occasions); *Costello v. Costello*, 465 S.E.2d 620, 623–25 (W. Va. 1995) (holding that an insurance agent's conduct during the application process suggesting that insured's wife would be listed on automobile policy as an additional named insured may have created a reasonable expectation of insurance in a negligence claim against the insurance agent); *Keller v. First Nat'l Bank*, 403 S.E.2d 424, 427–30 (W. Va. 1991) (finding that an offer to insure extended by mistake created an expectation of coverage and, therefore, the insurer couldn't deny coverage); *Romano v. New England Mut. Life Ins. Co.*, 362 S.E.2d 334, 339–40 (W. Va. 1987) (finding unambiguous policy exclusion not applicable because promotional materials provided to the insured led him to a reasonable belief that he was covered under the policy).

In *Romano* for example, a case concerning a group insurance plan with a complex master policy and a simpler handbook prepared by the insurer that misstated certain policy terms, the court held that "where an insurer provides sales or promotional materials to an insured under a group insurance policy, which the insurer knows or should know will be relied upon by the insured, any conflict between such materials and the master policy will be resolved in favor of the insured." 362 S.E.2d at 340.

Here, however, Safe-Guard provided no promotional materials for its policy to Hinkle, and the GAP Addendum, including all terms and conditions, is a mere two pages long. Hinkle also admits that she read the terms and conditions, which expressly excluded

17

"finance or lease charges, late charges, [and] delinquent payments," J.A. 118, before agreeing to purchase the policy.

On this record, we agree with the district court that "no reasonable person would expect credit for one's own delinquency." J.A. 441. To hold otherwise would defy common sense and turn insurance law on its head.

\* \* \*

For the reasons given, we affirm the district court's judgment.

*AFFIRMED*